J-S51016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: K.E.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M.H., NATURAL MOTHER | No. 355 MDA 2014 |

Appeal from the Order dated January 22, 2014,
in the Court of Common Pleas of Centre County,
Orphans' Court, at No(s): 3862

| | |
|---|---|
| IN RE: C.L.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M.H., NATURAL MOTHER | No. 356 MDA 2014 |

Appeal from the Order dated January 22, 2014,
in the Court of Common Pleas of Centre County,
Orphans' Court, at No(s): 3861

BEFORE:    BOWES, OTT, and MUSMANNO, JJ.

MEMORANDUM BY OTT, J.:                          **FILED OCTOBER 07, 2014**

L.M.H. ("Mother") appeals from the orders in the Court of Common Pleas of Centre County involuntarily terminating her parental rights to her sons, K.E.H., born in September of 2008, and C.L.H., born in October of 2006 (collectively, "the Children").[1]  We affirm.

The record reveals the relevant factual and procedural history, as follows.  On April 30, 2012, the Children were placed in the custody of the Centre County Children & Youth Services ("CYS") due to a report of child

---

[1] The orphans' court involuntarily terminated the parental rights of E.P.C., the biological father of K.E.H., and R.E.K., the biological father of C.L.H., by orders dated October 28, 2013.  Neither of the biological fathers filed a notice of appeal.

abuse involving C.L.H. The report alleged that Mother slapped C.L.H. in the face leaving her handprint, and that she held C.L.H.'s mouth and nose closed, resulting in him being unable to breathe. N.T., 10/28/13, at 84, 86. The Children were adjudicated dependent on May 8, 2012. As a result of the allegations involving C.L.H., Mother was charged with the crime of simple assault. Following a trial, she was convicted of the charge and sentenced to a term of incarceration for ninety days, *i.e.*, from January 17, 2013, to April 19, 2013, after which she was placed on parole. *Id.* at 84, 141; N.T., 1/22/14, at 84.

Since 2004, CYS had received numerous reports concerning Mother's use of inappropriate physical discipline, Mother's inappropriate supervision, Mother's drug and alcohol use, and issues concerning Mother's mental health. N.T., 10/28/13, at 50-51. In fact, A.J.H., Mother's older son and the Children's half-brother, was placed in the custody of CYS on two occasions, the second time being in March of 2011, due to allegations that Mother had hit him with a board multiple times and, contrary to CYS's directive, had left him temporarily in the care of R.H., her oldest son. *Id.* at 55-56. At the time of the Children's placement, A.J.H. remained dependent.

The Children's initial permanency goal was reunification. CYS established the following Family Service Plan ("FSP") objectives for Mother, in part: acknowledge and cease use of inappropriate physical discipline; maintain regular contacts and visits with the Children; cooperate with

reunification services; attend counseling regularly to work on emotional and parenting issues; and attempt to learn and demonstrate in the Children's presence proper ways to provide nurturance and discipline. *See id.* at Exhibit 6, ¶¶ 8-9. By order dated November 27, 2012, the Children's permanency goal was changed to planned permanent living arrangement/long-term foster care with a concurrent goal of adoption. *See id.* at Exhibit 24.

On April 26, 2013, CYS filed petitions for the involuntary termination of the parental rights of Mother and the respective biological fathers of the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). In addition, CYS filed a petition for the involuntary termination of Mother's parental rights to her older son, A.J.H., who is not a subject of this appeal.[2] An evidentiary hearing was held on October 28, 2013, with respect to A.J.H. and the Children, and on January 22, 2014, with respect to the Children only. CYS presented testimony from the following witnesses, in relevant part: Joshua Martin, a detective at the Ferguson Township Police Department; Christie Plazio, a family reunification counselor with the Centre County Youth Service Bureau, which was a service provider for CYS; and Casie Lea Rockey, a CYS casework supervisor. The Guardian *Ad Litem* ("GAL") presented the testimony of Kyle Jordan, Mother's probation and

---

[2] On December 18, 2013, CYS withdrew the petition for the involuntary termination of Mother's parental rights to A.J.H.

parole officer. Mother testified on her own behalf, and she presented the testimony of R.H., her oldest son, and R.H.'s girlfriend, D.L.

By orders dated January 22, 2014, the orphans' court involuntarily terminated Mother's parental rights to K.E.H. and C.L.H. Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.

On appeal, Mother raises one issue for our review:

> I. Did the Court of Common Pleas err by forever terminating the parental rights and duties of [Mother] with regard to K.E.H. and C.L.H.?

Mother's brief at 4.

We review this appeal according to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We

- 4 -

observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A.

§ 2511). The burden is on the petitioner to prove by clear and convincing

evidence that the asserted statutory grounds for seeking the termination of

parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, we conclude that the orphans' court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b); ***see also In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that this Court need only agree with any one subsection of 23 Pa.C.S.A. § 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

With respect to Section 2511(b), the requisite analysis is as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that the orphans' court erred in terminating her parental rights because the issues involving her harsh discipline of the Children have been resolved. In addition, Mother argues that, shortly after the order terminating her parental rights, the Children's foster parents "requested the removal of K.E.H. and C.L.H. from their home, resulting in the worst possible status for the boys: that of legal orphans." Mother's brief at 7. Mother argues that the GAL and the orphans' court "may have reached a different conclusion had they known that K.E.H. and C.L.H. would not be adopted. . . ." *Id.* at 8.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court found as follows:

> Despite being offered a plethora of services to guide her away from harsh discipline and the use of drugs and alcohol, [Mother] rejected services and continued to discount as being untrue any of the instances where she tested positive for drugs and alcohol. [Mother] was generally uncooperative and denied access to her home and refused to provide information regarding the boys' health care and the names of relatives for the Family Connections process. [Mother] denied any responsibility for the incident involving striking [C.L.H.] on the face and pushed the blame onto the authorities for not allowing the child to tell his full story. . . . She consistently discounted positive drug tests and denied using alcohol or drugs. . . . The Court found no desire to change in [Mother]; rather, she demonstrated an ongoing refusal to comply with simple rules.
>
> This Court also took into consideration the opinion of the [GAL] . . . who had opportunities to spend time getting to know the boys and to evaluate their adjustment in the foster home. [The GAL] indicated that both boys wish to stay in the [foster] home permanently. [The GAL] supported termination of [Mother's] parental rights. This Court found that [Mother] could not offer the [C]hildren stability and concluded that termination of her

rights would best serve the needs and welfare of [C.L.H.] and [K.E.H.].

Trial Court Opinion, 3/24/14, at 7-8.  The testimonial evidence supports the court's findings, as follows.

Christie Plazio, a reunification counselor with the Centre County Youth Service Bureau, was involved with this family beginning in December of 2011, when only A.J.S., the older child, was in the custody of CYS, and continuing thereafter, when the Children were also in the custody of CYS. Her involvement lasted until November 27, 2012, at which time reunification services were ended.  Ms. Plazio testified on direct examination as follows:

> Q.  What was [Mother's] approach to the reunification services being offered to her?  Was she cooperative?  . . . .
>
> A.  Overall she was not.  [Mother] through the duration of services refused to participate in the Family Connections process, which is a state mandate.[3]  She also refused up until I believe October of 2012 to participate in random drug testing.

N.T., 1/22/14, at 12.

Ms. Plazio testified that her agency provided Mother with "very specific expectations" that she had agreed upon, but, by September 13, 2012, she had "failed to comply with any of them."[4]  *Id.* at 13.  For instance, Ms. Plazio

---

[3]  Ms. Plazio testified that the Family Connections process involves "identifying resources and supports for the family.  And you start with identifying 40 people and then that list gets cut down to 20 that the family chooses to contact."  N.T., 1/22/14, at 37.

[4] Ms. Plazio testified that her agency held a status review conference with Mother on September 13, 2012.  She explained that, "it was laid out that [Mother] needed to comply with all of [the] expectations in order for

explained that her agency conducted unannounced home visits to Mother, and a procedure was established that, if Mother was not home, the counselor would leave a business card, and Mother was to place a telephone call to the counselor whose name was on the business card. *Id.* The Youth Service Bureau conducted twenty-nine unannounced visits, and Mother was home for five them. *Id.* at 14. Mother placed a telephone call to the visiting counselor only one time out of all the missed visits. *Id.* at 15. In addition, Ms. Plazio testified that Mother was to participate in weekly sessions with the reunification counselors. *Id.* at 9. She testified, "[m]any times [Mother] either canceled them or [Mother] would ask us to leave within about approximately a half hour of being there and sessions typically last about an hour." *Id.* at 9-10; *see also id.* at 13.

Ms. Plazio testified regarding an incident that occurred between Mother and the Youth Service Bureau on June 21, 2012, which the orphans' court aptly summarized as follows:

> Ms. Plazio stated that [Mother's] behavior was unpredictable and erratic. She was observed to be agitated and her eyes rolled back and her eye[]lids fluttered quickly. On one occasion during a visit with [C.L.H.] and [K.E.H.] at the CYS office, [Mother] left the room to use the restroom and upon returning, she appeared very agitated and could not be calmed down. [When] [s]he was told to pull herself together or the visit would be cancelled, she swore and screamed at [the] caseworker[s]. . . . She pushed her way past a guard through the secured area. She then

services to continue. She chose not to. So when we had the [permanency review] hearing in November [27, 2012], we had requested to end services because it was apparent that [Mother] was not going to comply with the expectations." N.T., 1/22/14, at 29.

- 10 -

dropped her trousers exposing her buttocks and said, "kiss my black ass." [Mother] was escorted out of the office by the sheriff's deputies. Because the incident occurred during a visit, the [C]hildren witnessed the incident.

Trial Court Opinion, 3/24/14, at 3 (citations to record omitted); **see also** N.T., 1/22/14, at 22-25, 47-48.

With respect to random drug testing, Ms. Plazio testified that Mother participated in three tests while she was the family's reunification counselor. **Id.** at 18. Mother participated in the first random drug test on October 5, 2012, and it was positive for THC (marijuana), alcohol, opiates, and cocaine. **Id.** at 20. The second test was on October 27, 2012, but Ms. Plazio explained that CYS "cannot use it due to the fact that the specimen had apparently leaked on the way to the lab, and the label was difficult to read, and [the lab] misdated it. . . ." **Id.** Mother participated in the third test on November 7, 2012, and it was positive for THC and alcohol. **Id.** Ms. Plazio testified on direct examination:

Q. Did [Mother] refuse to be tested on occasion?

A. There were occasions where she did refuse.

Q. For any particular reason offered?

A. For many of the occasions it was simply that she stated . . . she wasn't able to produce a sample. Towards the end of services I believe our last session she told us that she refused to [produce a sample] because she didn't see a point and she did not give a damn.

**Id.** at 17-18.

Finally, Ms. Plazio testified:

- 11 -

Q. Do you believe that [Mother] has remedied the situations that caused the removal of these children to the point where she can take care of [C.L.H.] and K.E.H.]? At least up to the point that your agency –

A. I was going to say up to the point where reunification services were involved, no.

*Id.* at 51-52.

Casey Rockey, a CYS casework supervisor, testified on direct examination that Mother tested positive most recently "for marijuana, which is THC, on January 17, [2014]."[5] N.T., 1/22/14, at 59. Ms. Rockey testified as follows on direct examination:

Q. What is [CYS's] position of what's appropriate for [C.L.H.] and [K.E.H.] at this point?

A. Our position remains that [C.L.H.] and [K.E.H.] should be freed for adoption by the Court terminating [Mother's] parental rights. . . .

Our position is that throughout our involvement with [Mother] that conditions that warranted the removal of the children continue to exist as evidenced by the most recent drug and alcohol test. In addition to her drug and alcohol test, she had criminal involvement throughout our agency's involvement and has really not been cooperative with our agency, refused access to the home, and even was not able to refrain from using physical discipline on her children, which resulted in [C.L.H.] and [K.E.H.] coming into the care and custody of the agency.

*Id.* at 62-63. In addition, Ms. Rockey testified as follows:

Q. Do you believe that [Mother] can remedy [the conditions which led to the Children's placement]?

A. No, we do not.

---

[5] Kyle Jordan, Mother's probation and parole officer, testified that his office conducted the drug test on January 17, 2014. N.T., 1/22/14, at 84.

Q. Are there any services or assistance that [CYS], the Youth Service Bureau, or any other agency available in Centre County or elsewhere could offer or make available to [Mother] that would remedy the conditions which cause[d] both [C.L.H.] and [K.E.H.] to be in placement. . . ?

A. No. In fact, we've exhausted all of our services. Even prior to reunification, we attempted to provide in-home Family Intervention Crisis Services, they have a family preservation component, which [Mother] ultimately was uncooperative with, not only on a voluntary level but after the Court ordered her participation in that program.

. . .

Q. So, no services for them that could remedy those conditions by any other agency beyond [CYS] that you're aware of?

A. Not that I'm aware of. Because ultimately, safety has to be assured by the [CYS] office and [Mother] has continued to deny us access to her home.

N.T., 10/28/13, at 125-126.

Kyle Jordan, Mother's probation and parole officer, testified that Mother was paroled on her sentence for simple assault in April of 2013, and that her parole term expires in December of 2017. N.T., 1/22/14, at 84, 86. Mr. Jordan testified that Mother had two parole violations recently, one was the positive drug test on January 17, 2014, and the other was she traveled out of state without permission. *Id.* at 87. Mr. Jordan testified that, as a result of these parole violations, Mother "received a verbal warning and was referred to outpatient drug and alcohol counseling." *Id.*

Mother acknowledged on direct examination that her relationship with CYS "did become a little bit hostile." N.T., 1/22/14, at 102. She stated, "I

- 13 -

have since learned that in order for my children to be better represented I have to take a look at the way how [sic] I'm reacting to what's their best interest." *Id.* Mother testified that, as a result of switching therapists, "I have started to understand, you know, how my reaction toward certain things – how it will be viewed to others, so – meaning, you know, we have worked on my tone, the way that I answer things, and overall just my mannerism, and I have improved those to better for [sic] my children." *Id.* at 104.

Nevertheless, even though convicted by a jury of simple assault against C.L.H., Mother continues to dispute that she committed the crime during her cross-examination by counsel for CYS. *Id.* at 127-128. Indeed, Mother disputed that she used inappropriate physical discipline with any of her children. She testified on direct examination that,

> Not saying that I'm perfect by no means, but I do come from a strict background that means you do what you say and you say what you mean. So with that being said, I'm very stern with my children in the way that I want them to conduct themselves, not by physical, but by setting boundaries and moving forward with those boundaries.

*Id.* at 93; *see also id.* at 120-121. In addition, Mother denied that she has a history of illegal drug use or that she currently has a drug problem. *Id.* at 127-128. In fact, Mother testified, "I have used [illegal drugs] once in 10 years. I don't consider that a history of it." *Id.* at 128.

Mother testified on cross-examination by the GAL:

Q. So is it your expectation that this judge would say today that the [C]hildren are back with you or restart reunification? What is it that you want today?

A. Well, what – I would love for my children to be – to return to me today. That would be my hope and that's what I hold in my heart. But I do understand that my previous behavior before perhaps has put a little damper on that being just clear set. So I am prepared and willing to receive any kind of reunification that I am able to participate in to obtain my children. I am willing to work towards that, as I have been doing since they have been in care.

*Id.* at 119. Mother subsequently testified, "I'm not perfect but I do believe that I deserve a second chance [to be reunified with the Children]." *Id.* at 170.

Based on the foregoing testimony, we conclude that the orphans' court did not commit an error of law or abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2). Mother's repeated and continued incapacity, abuse, neglect or refusal to acknowledge her use of inappropriate physical discipline and her illegal drug abuse, in addition to her lack of cooperation with CYS and reunification services, has caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Further, the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied within the foreseeable future. Indeed, Mother's request for a second chance at reunification is disingenuous when she has already had the opportunity to demonstrate that she can provide proper parental care. ***See In re Adoption of M.E.P., supra***, 825 A.2d at 1276 ("A child's life simply cannot

be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." (citation omitted)).

We next review the termination orders pursuant to Section 2511(b), which focuses on whether termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Children.

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The *T.S.M.* Court quoted with approval, as follows:

> [A]s Judge Tamilia eloquently observed while speaking for the [Superior] court, it is "an immutable psychological truth" that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, Judge Tamilia cautioned against denying termination of parental rights based solely on the fact that a child has an attachment to the parent: "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* at 535 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J., dissenting).

*In re T.S.M.*, 71 A.3d at 267 (footnote omitted). Further, the *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts

- 16 -

fail . . . the result, all too often, is catastrophically maladjusted children."
***Id.*** at 269.

In this case, the record demonstrates that the Children may harbor some positive emotion toward Mother. ***See*** N.T., 1/22/14, at 81; N.T., 10/28/13, at 146-147, 158-159. However, by the last day of the termination hearing, the Children were in a pre-adoptive foster home, where they had resided for a short time, since December 3, 2013, and Ms. Rockey, the CYS casework supervisor, testified that the Children "continue to do well in the home." N.T., 1/22/14, at 60. Ms. Rockey testified, in part,

> I last visited the home on January 16th, was able to speak with [C.L.H.] and [K.E.H.]. They've indicated that they want to stay in this home. I talked with them about our recommendation and used the term forever home and they were comfortable and excited.

***Id.*** She stated that it was in the Children's best interests to be "freed for adoption." ***Id.*** at 62. She further opined, "Our agency believes these children are absolutely adoptable whether or not they are adopted by this foster family." ***Id.*** at 66. The GAL also expressed support for the termination of Mother's parental rights, stating the Children had indicated a desire to remain with their foster family. ***Id.*** at 205-206, 208-209.

In this appeal, Mother asserts that, after the termination orders were issued, the foster parents "requested the removal of K.E.H. and C.L.H. from their home. . . ." Mother's brief at 8. Mother argues that that the GAL and the court "may have reached a different conclusion had they known that

K.E.H. and C.L.H. would not be adopted. . . ." ***Id.*** To the extent Mother argues that this Court reverse the termination orders because the Children allegedly are no longer in a pre-adoptive home, we reject her claim.

This Court cannot consider that which is not part of the record in this matter, nor allegations of events that occurred after the record was closed before the orphans' court. ***See generally, Jahanshahi v. Centura Development Co., Inc.***, 816 A.2d 1179, 1183 (Pa. Super. 2003); ***Hrinkevich v. Hrinkevich***, 676 A.2d 237, 240 (Pa. Super. 1996). ***See also Larson v. Diveglia***, 700 A.2d 931, 934 n.4 (Pa. 1997) ("This court has consistently maintained that the practice of alleging facts in a brief upon which a trial court has not passed is improper." (citation omitted)). Therefore, the status of the Children's foster placement subsequent to the termination of parental rights is not a proper consideration of this Court in reviewing the termination orders.

Moreover, the ***T.S.M.*** Court noted that, "the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies . . . ." ***In re T.S.M.***, 71 A.3d at 268; ***see also*** 23 Pa.C.S. § 2512(b) (providing, "[i]f the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists"). Therefore, even if the Children were not in a pre-adoptive placement at the time of the

termination hearing, it would not necessarily be fatal to CYS's petitions for the involuntarily termination of Mother's parental rights.

Upon careful review, we discern no abuse of discretion by the orphans' court in concluding that the termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Children pursuant to Section 2511(b). *See In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (stating that "a parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment"). Accordingly, we affirm the orders involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/2014

- 19 -