**Mehrdad Jon JAHANSHAHI, Shahrokh Naghdi and Happy Valley Roasters, Inc., Appellants**

v.

**CENTURA DEVELOPMENT CO., INC., and Keith Eck, Appellees.**

**Mehrdad Jon Jahanshahi, Shahrokh Naghdi and Happy Valley Roasters, Inc., Appellees**

v.

**Centura Development Co., Inc., and Keith L. Eck, Individually and as President of Centura Development Co., Inc., Appellants.**

Superior Court of Pennsylvania.

Argued Nov. 20, 2002.
Filed Feb. 4, 2003.

Matthew J. Zeigler, Williamsport, for Jahanshahi.

Norman M. Lubin, Williamsport, for Eck.

Before: STEVENS, OLSZEWSKI, and BECK, JJ.

OLSZEWSKI, J.

¶ 1 This is an appeal and a cross-appeal from judgment entered after a jury verdict in these consolidated cases. Both sides have assigned a number of errors to the trial court. We affirm.

¶ 2 Mehrdad Jon Jahanshahi and Shahrokh Naghdi (appellants) sought to lease an existing, empty Hardee's fast food restaurant building from Keith L. Eck (appellee) to open a Kenny Rogers Roasters franchise of their own. During a period of negotiation, appellee repeatedly assured appellants that the property would be leased to them, and led them to believe that they were the only prospective tenant. 1925(a) Opinion, 2/8/02, ("Opinion") at 9. Appellants conducted research to create a business plan to "demonstrate the economic viability of the proposed restaurant." *Id.* at 10. Appellants also expended other sums of money for equipment and services in anticipation of opening the restaurant.

¶ 3 On July 9, 1997, the parties met at appellee's office to sign a lease that had been printed on appellee's computer. Appellants signed the lease, and "pushed [it] toward [appellee] Eck for him to sign. [Appellee] Eck did not sign but indicated he would mail [appellants] a signed copy." *Id.* at 11. As stated by the trial court:

> On July 22, 1997, [appellee] Eck orally informed [appellant] Jahanshahi that he had changed his mind and was not going to lease the premises to them. Instead, [appellee] Eck stated that he had received an offer to purchase the building from an undisclosed buyer for $750,000, a deal he had always wanted. [Appellee] Eck was always looking to use a signed lease to negotiate a better deal,

one that he was always looking for with [another] Company. *Id.* at 13. Appellants claimed at trial that appellee offered to reimburse them for their prior out-of-pocket expenses if they "would hold on, not complain about the change in plans, and be ready to continue with the lease agreement if the $750,000 did not germinate." First Amended Complaint, 12/17/99, at 11. Appellants alleged that they accepted this offer, but that appellee never satisfied this second contract. *Id.*

¶ 4 At trial, the jury found for appellants, and awarded them $7,850 for out-of-pocket expenses and $70,000 for loss of profits. Both sides filed post-trial motions, with appellee first on May 30, 2001. Opinion at 14. Hearings on the motions were delayed until October 24, 2001, and an order was filed that the trial judge would render a decision by November 21st. Rather than wait for the decision, appellants filed their appeal on October 29th. Appellee then cross-appealed.

■ ¶ 5 Although neither the trial court nor the parties raised the issue of appealability, "[w]e may raise [it] *sua sponte* because it affects our jurisdiction over the case." *Estate of Borkowski,* 794 A.2d 388, 389 (Pa.Super.2002). This Court may only hear an appeal from the "final order of . . . [a] lower court." Pa.R.A.P. 341(a).

■ ¶ 6 However, the judgment here is appealable. The Rules of Civil Procedure allow either party to praecipe the prothonotary to enter judgment where, even though post-trial motions are filed, more than 120 days pass with no decision having been made to dispose of them. Pa.R.C.P. 227.4. *See Armbruster v. Horowitz,* —— Pa. ——, 813 A.2d 698 (2002); *Conte v. Hahnemann Univ. Hosp.,* 707 A.2d 230, 231 (Pa.Super.1998) ("In view of the language of Rule 227.4(1)(b) and the explana-

tory comment, it is clear that once the requisite 120 day period runs and a party opts to praecipe for the entry of judgment, the judgment becomes final, and immediately appealable, when it is entered on the docket.").

■ ¶ 7 That was the case here. Appellants' brief contains a copy of their Praecipe to Enter Judgment. Although we are unable to use this information because the praecipe is not part of the certified record, *Hrinkevich v. Hrinkevich,* 450 Pa.Super. 405, 676 A.2d 237, 240 (1996), it explains why the official docket entry record attached to the certified record indicates that the prothonotary entered judgment on October 29, 2001. "The certified record consists of the original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and *a certified copy of the docket entries prepared by the clerk of the lower court.*" *Hrinkevich,* at 240 (emphasis added); *see also* Pa. R.A.P.1921. As the docket entry list attached to the certified record indicates that the prothonotary entered judgment on October 29, 2001, we find that the entry of judgment is part of the official record. The entry of judgment is a final order for purposes of our review. Pa.R.C.P. 227.4(1)(b).

¶ 8 We turn now to the assignments of error, which we will address in the order of the trial court's 1925(a) Opinion.

I. *Appellant Assignment II: Exclusion of Evidence of Equipment Costs*

■ ¶ 9 Appellants' damages claim included the cost of the equipment they purchased in anticipation of opening their restaurant. The trial court ruled that appellants had not provided appellee the evidentiary basis for this claim, although it had been requested during discovery, and excluded this evidence. Appellants assign error. Our standard of review:

"The decision whether to sanction a party for a discovery violation and the severity of such a sanction are matters vested in the sound discretion of the trial court. We will not reverse a trial court's order imposing such a sanction unless the trial court abused its discretion." Under Rule 4019 of the Pennsylvania Rules of Civil Procedure, a trial court may impose sanctions for discovery violations.

*Pioneer Commer. Funding Corp. v. Am. Fin. Mortg. Corp.*, 797 A.2d 269, 286–87 (Pa.Super.2002) (quoting *Luszczynski v. Bradley*, 729 A.2d 83, 87 (Pa.Super.1999)). Below, appellants argued that no discovery request was made for this information. Appellants' brief at 21. The trial judge states that such discovery was requested three times before the cutoff, Opinion at 20, and our own search of the record reveals such a request in the Defendants' Second Set of Interrogatories. Motion to Compel Answers, 7/19/00, Exhibit A.

¶ 10 Obviously, appellee needed to know the basis of these costs in order to properly defend against them. Such information is the subject of discovery. Pa.R.C.P. 4003.1. The trial court states that it excluded this evidence because appellee's defense was "substantially prejudiced by [appellants'] failure," Opinion at 20, and we see no abuse of discretion.

## II. *Appellee Assignment IV: Admission of Appellant as an Expert Witness*

¶ 11 Appellee assigns error to the trial court's admission of appellant Jahanshahi's testimony as an expert witness as to lost profits on the basis that he, as a plaintiff, was not disclosed as a potential expert witness during discovery. Even if the procedural rules had been followed, appellee argues, he did not satisfy Pa.R.E. 702's requirements to qualify as an expert. Appellee's brief at 14.

¶ 12 The trial court states that appellee's original objection was to appellant Jahanshahi's testimony on lost profits on the basis that, under the Restatement of Contracts, expert testimony was necessary to establish lost profits. Opinion at 22–23. The trial court relied on *Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.*, 315 Pa.Super. 469, 462 A.2d 686 (1983), for the proposition that expert testimony is not required. We agree. There, this Court held:

Damages for lost profits, like other contract damages, may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation. Sufficient evidence must be introduced to permit a reasonably certain estimate of the amount of anticipated profits lost due to the breach.... [T]he courts of this Commonwealth have adopted the rule suggested by [the] Restatement ... that new businesses may be able to adduce sufficient evidence to obtain an award for lost profits while recognizing that such proof is often more difficult to obtain and present.

*Id.* at 695–96. Specifically,

[L]ost profits from a new business may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.

*Id.* at 696 (quoting Restatement, Second, of Contracts § 352, Comment b). Thus, while expert testimony might well aid the factfinder, it is not required.

¶ 13 Nevertheless, appellant Jahanshahi was tendered and accepted as an expert. N.T. Trial Vol. II, 5/20/02, at 193–95. Here, appellee argues that, because appellant was not disclosed as an expert during discovery, Pa.R.C.P. 4003.5(b) prohibited

his testimony as an expert at trial. That Rule states: "An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action." But where "opinions were not acquired or developed with an eye toward litigation, Rule 4003.5 is inapplicable." *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525, 531–32 (1995).

¶ 14 Appellant Jahanshahi's testimony at trial was not "acquired or developed with an eye toward litigation." He testified:

> [A]s to his experience working for various restaurants and food industry operators. He testified as to ownership interest in various restaurants including other restaurant franchises. He testified that he consulted with the Kenny Rogers' corporate people as to how to go about determining whether or not the restaurant would be profitable. He testified of using comparative histories of other restaurants franchises and applying them to the demographic information he had obtained for the area of the proposed restaurant and that the source of that data was considered reliable in the industry.

Opinion at 24. It is obvious that this testimony was acquired or developed with an eye toward opening a franchise restaurant, not litigation. Rule 4003.5 is therefore inapplicable, making appellant Jahanshahi's testimony admissible.

¶ 15 Appellee also assigns error to appellant Jahanshahi's qualification as an expert, on the basis that he did not possess the "knowledge, skill, experience, training or education" required under Pa. R.E. 702. Appellee's brief at 14–15. The trial court's ruling that a witness is qualified to testify as an expert may only be reversed for an abuse of discretion. *Bennett v. Graham*, 552 Pa. 205, 714 A.2d 393, 395 (1998).

> In order to qualify as an expert in a given field, a witness must possess, at a minimum, "more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." The test is "whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question."

*Id.* (quoting *Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183, 185 (1997)). Here, appellant Jahanshahi sought to offer an opinion about the profits lost when appellee cancelled the lease agreement. His testimony, above, permitted the finding that he had "specialized knowledge on the subject matter." Therefore, the trial court did not err by qualifying him as an expert witness.

III. *Appellee Assignment V: The Business Plan*

¶ 16 Appellee assigns error to the related issue that the trial court permitted appellant Jahanshahi to testify about his business plan for the proposed restaurant. This plan provided support for appellant Jahanshahi's expert opinion as to lost profits. Opinion at 24. Appellee argues that while Pa.R.E. 703 permits expert witnesses to rely on the reports of third parties informing their opinions, there must be a showing that the reports are of the type relied on by expert witnesses. He states, "Here there was no such showing." Appellee's brief at 16. We disagree.

¶ 17 At trial, appellant Jahanshahi testified as to the information in his business plan, as well as the contractor that provided it. N.T. Vol. II, 5/20/01, at 182–83, 192–93. Further, to estimate lost profits, he testified that utilizing such information was "the way everybody does it, it's the only way to get that information." *Id.* at 183. "Questions concerning the admission and exclusion of evidence are within

the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." *General Equip. Mfrs. v. Westfield Ins. Co.,* 430 Pa.Super. 526, 635 A.2d 173, 182 (1993). Given appellant's testimony, the trial court did not abuse its discretion by permitting appellant to discuss the business plan.

## IV. *Appellee Assignment VII: Fraud and Misfeasance Claims*

■ ¶ 18 Appellee assigns error to the trial court for giving the appellants' fraud and misfeasance claims to the jury. Appellee points out that Count II was labeled "Detrimental Reliance" in the First Amended Complaint, and states that it was caught unprepared for the claim of civil fraud. Appellee's brief at 20. The trial judge points out that detrimental reliance is not a separate cause of action, and that Count II was clearly a claim for civil fraud. Opinion at 32, 34. He points to the language of the First Amended Complaint, which states:

37. Upon information and belief, the Defendant, CENTURA DEVELOPMENT CO. INC., through its duly authorized officers, agents and representatives, to wit: Defendant KEITH L. ECK, as acting within the scope of his employment and authority, deliberately made and/or permitted to be made representations to the Plaintiffs ... which they knew or should have known were false and misleading, as follows:

A. That [appellee] ... [was] looking for the [appellants] to open a Kenny Rogers Roasters Restaurant at the old Hardees building after renovations.

B. That no one else was interested in the property and [appellants] ...

[were] the only entity the [appellee] ... [was] negotiating with to rent the building.

C. That [appellee] ... knew [appellants] ... were expending monies in reliance on the promises made by [appellee] ... and in fact were encouraged to spend the monies to bring the lease agreement to consummation.

38. The actions and statements alleged by [appellee] KEITH L. ECK were false and misleading and were intended by [appellee] ... to induce [appellants] to enter into the lease agreement and expend monies toward that end.

39. The [appellants] were induced by and justifiably relied upon the misrepresentations described above in accepting the proposal of [appellee] ... and in expending sums of money toward the consummation of the lease agreement.

First Amended Complaint, 12/17/99, at 9–10. Fraud, or

Intentional misrepresentation has been defined as: "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance".

*Kramer v. Dunn,* 749 A.2d 984, 990 (Pa.Super.2000) (quoting *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 560 (1999)). The trial court was correct that the complaint states a claim for civil fraud.

■ ¶ 19 Appellee also argues that misfeasance, stated in the First Amended Complaint as Count V, is not an indepen-

dent cause of action; and so that claim should not have been given to the jury. Appellee's brief at 20. The "improper performance of a contractual obligation (misfeasance)" is an actionable tort. *Fink v. Delaware Valley HMO*, 417 Pa.Super. 287, 612 A.2d 485, 489 (1992). On the other hand, the mere failure to perform—nonfeasance—does not rise to the level of tort but rests in contract. *Id.* In that case, the plaintiff made allegations that:

> [T]he defendant "negligently [withheld] needed medical services from [her]; negligently inflict[ed] severe emotional distress and bodily harm to [her], including, but not limited to anxiety, sleeplessness, loss of weight, loss of appetite, headaches, severe depression, nausea, cosmetic deformity and a severe loss of quality of her life; negligently depriv[ed][her] of her right to choose between two medically accepted procedures for the treatment ...; permitt[ed] its employees, who are not medical doctors, to override the recommendations of four physicians; negligently process[ed her] application for medical benefits; [and] conspir[ed] to force [her] to live with a shoulder deformity.

*Id.* The Court concluded that this conduct, as alleged, rose above nonfeasance to misfeasance.

¶ 20 The question, then, is whether appellants' allegations also rose above to the level of misfeasance. Here, Count V of appellants' First Amended Complaint states:

> 47. By his actions, ... [appellee] Keith L. Eck intended to place [appellee] Centura Development Co., Inc. in a strong bargaining position by causing [appellants] to commit to the lease agreement through [appellants'] ... signatures.

> 48. By offering to pay back [their out-of-pocket] expenses ..., [appellee] KEITH L. ECK obligated [appellee] CENTURA DEVELOPMENT CO. INC. to pay damages of a breached contract that would be against [appellee] CENTURA DEVELOPMENT CO. INC.'s interests.

> 49. The actions of [appellee] Keith L. Eck caused harm and injury to the [appellants] for lost investment and lost income in this business venture.

First Amended Complaint at 12. The actions referred to in paragraphs 47 and 49 included the following: that appellee Eck promised to lease the subject property to appellants and presented them with a lease; that appellants visited appellee Eck at his office to sign the lease that he had prepared, but that he did not sign the lease and instead "assured all the Plaintiffs he would do so in the future"; that appellants believed at the time that there had been a meeting of the minds; that appellants incurred costs in anticipation of the lease being executed and that appellees were aware of these expenditures; that appellee Eck later advised appellants that he had changed his mind and withdrew the lease because he had gotten an offer to purchase the property; that appellee Eck had never had any "intention of signing the lease but wanted to bind the Plaintiffs to the written agreement by their signatures"; and that appellee Eck promised to pay for their out-of-pocket expenses. *Id.* at 3–7.

¶ 21 The trial court here believed that these allegations rose to the level of misfeasance, and we see no reason to disagree. Therefore, it was not error for it to give that claim to the jury.

V. *Appellant Assignment III: Punitive Damages Instruction*

¶ 22 Appellants make a passing argument that the trial court instructed

the jury improperly on punitive damages, and seek a new trial on that issue. They state that the trial court instructed the jury that "punitive damages could only be awarded for 'malicious, wanton, reckless, willful or oppressive' conduct." Appellants' brief at 13; N.T. Trial Vol. III, 5/22/01, at 424. They state that the law of the Commonwealth is that punitive damages are appropriate where a defendant acts with "bad motive or with reckless indifference to the interests of others." Appellant's brief at 13 (quoting *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963)). Further, appellants claim that when they objected to the court's instruction language, it gave appellees the "choice of which instruction they wanted." *Id.*

¶ 23 We find this argument misleading. The objection exchange occurred during a sidebar just after the instructions were given to the jury:

Mr. Ziegler [plaintiffs-appellants]: Actually, Your Honor, that reminds me of another objection I had as to the punitive damage instruction. The malicious wanton and all that, that's not the law anymore, it's actually bad motive or reckless indifference now.

The Court: Understand the contention. Do you want me to correct that?

Mr. Lubin [defendants-appellees]: I think the charge, first of all he should not have had the charge to begin with.

The Court: Let's return any other—any other problems with the questions?

Mr. Ziegler: Not that I see right now, Your Honor.

N.T. Vol. III, 5/22/01, at 433. First, there is no indication that the court solicited only defense counsel's input. Second, neither counsel answered the question. Third, ap-

pellants' counsel did not seek a ruling to clarify his position for the record. Rather, he acquiesced to the instruction as posed. Because appellants' counsel acquiesced, we find that this issue was waived. *Strickler v. Huffine*, 421 Pa.Super. 463, 618 A.2d 430, 437 (1992).

¶ 24 Even if we were to entertain it, appellants' argument would fail. The *Chambers* language quoted above is only one, rather dated, statement of the law of punitive damages. Another, much more recent, statement is found in *Johnson v. Hyundai Motor America*, 698 A.2d 631 (Pa.Super.1997), in which this Court held that "a court may award punitive damages only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others." *Id.*, at 639. The language of the instruction given here was almost an exact statement of the language of *Johnson*. The trial judge did not err.

## VI. *Appellant Assignment I: Prejudgment Interest*

¶ 25 Appellants claim that they were entitled to pre-judgment interest as a "matter of right." Appellants' brief at 8. The trial judge states that they first raised this issue in their post-trial motion, Opinion at 39, and appellants do not dispute that assertion here.

¶ 26 While it is true that appellants did raise this issue in the trial court, they precluded it from deciding the issue. Argument on the post-trial motions was held on October 24, 2001, appellants were given until November 2nd to file a responsive brief, and the trial court planned to decide the motions by November 21st. Order, 10/24/01. Instead of waiting, appellants filed their Notice of Appeal on Octo-

ber 29th, effectively co-opting the trial court's decision on this issue.

> Claims which have not been raised in the trial court may not be raised for the first time on appeal. Our Supreme Court has frequently stressed the necessity of raising claims at the earliest opportunity, ... [to] eliminat[e] the possibility that an appellate court will be required to expend time and energy reviewing claims on which *no trial ruling has been made.*

*Mazlo v. Kaufman,* 793 A.2d 968, 969 (Pa.Super.2002) (citations omitted) (emphasis added). As no trial court ruling was made on the issue of prejudgment interest, at the fault of appellants, we decline to review it.[1]

## VII. *Appellee Assignment VI: Statute of Frauds*

¶ 27 Appellee raised the statute of frauds as a defense on the basis that he had not signed the lease, and sought pretrial summary judgment. The trial court denied the motion, and appellee assigns error. Initially, we note that appellee did not include this point in his 1925(b) statement; however, the trial court addressed the issue briefly in its 1925(a) opinion, and more thoroughly in the opinion accompanying its ruling on the summary judgment motion. As the issue will prove unavailing to appellee, we will address it.

¶ 28 The statute of frauds requires that any lease of real property for a period of more than three years be put into writing. 33 P.S. § 1 (1772); 68 P.S. § 250.202 (1951). The lease term here was for at least five years, First Amended Complaint, at Exhibit A, but the statute's ostensible application is only the beginning of our inquiry.

¶ 29 In ruling on the summary judgment motion, the trial court found that "the jury could conclude that the facts in this case satisfy the requirements for a real estate contract as enunciated in *GMH* [*Assoc., Inc. v. Prudential Realty,* 752 A.2d 889 (Pa.Super.2000) ]." Opinion and Order, 3/29/01, at 9. In that case, this Court held that parties may enter an oral contract to later enter a written contract for the sale of real property. *GMH,* at 900.[2]

¶ 30 Although the court reached the correct conclusion, we believe that *Na-*

---

1. In any event, appellants' premise is flawed. They cite *Penneys v. Pennsylvania R. Co.,* 408 Pa. 276, 183 A.2d 544 (1962), for the proposition that they had a right to prejudgment interest. There, our Supreme Court awarded such interest because there was a "seemingly interminable delay between the loss and the entry of judgment"—almost seven years. *Id.* at 546. The Court's decision was a matter of fairness, but certainly did not establish such an award as a matter of right. In addition, our review of the record reveals that the length of time between the loss and the entry of judgment—July 22, 1997 to October 29, 2001—is just over four years and three months. Appellants do not explain, nor is it readily apparent, why this was an "interminable delay."

2. In his brief, appellee does not address *GMH.* Instead, he states that the basis of the court's ruling was *Kazanjian v. New England Petroleum Corp.,* 332 Pa.Super. 1, 480 A.2d 1153, 1157 (1984). Appellee contends that the trial court erred because *Kazanjian* concerned a litigation settlement contract. According to appellee, that case is inapplicable here because this contract was for a leasehold of real property.

Without deciding whether *Kazanjian* is applicable to this case, we note that the trial court relied on it to deny appellee's preliminary objections. The court made only passing reference to the case in the "Facts and Procedural History" section of his summary judgment opinion. Opinion and Order, 3/29/02, at 5–6. The court's discussion of the statute of frauds issue in that document, however, never mentions *Kazanjian.* Instead, it relies on *GMH.* As appellee is raising the court's denial of his summary judgment motion, an

*kles v. Union Real Estate Company of Pittsburgh,* 415 Pa. 407, 204 A.2d 50 (1964), more squarely resolves this issue because it addresses a leasehold contract rather than one for a land sale.[3] There, on August 16, 1957, the parties reached an agreement as to the rent payment for a commercial property and shook hands on it. Plaintiffs-tenants then paid the first month's rent by check and received a receipt. Defendant-lessor sent three copies of the lease to the plaintiffs, which they signed and sent back. The defendant also sent a letter to a contractor the plaintiffs had hired to convert the property into a restaurant, stating that the plaintiffs were renting the property.

¶ 31 Eleven days later, a day before the lease was to take effect, the defendant wrote the plaintiffs to inform them that it would not lease them the premises. The defendant then re-rented the property to another tenant for more rent. The plaintiffs sued, and the defendant claimed that no valid lease existed because it had not been reduced to writing and was therefore proscribed by the statute of frauds.

¶ 32 Our Supreme Court held that "the mere formality of reducing an agreement to a writing when not accomplished will not destroy the agreement, if the agreement does not fall within the Statute of Frauds." *Id.* at 51. The Court held that the "evidence in this case indicates a meeting of the minds by the parties as of August 16, 1957, when [the plaintiffs] paid the first month's rent. [The defendant's] acceptance of the check, the mailing of the lease and [the defendant's] letter to [the contractor] are all indicative of an *agreement* which merely awaited the formality of being reduced to writing." *Id.* (emphasis added). "Thus, under the Pennsylvania Statute of Frauds, Act of March 21, 1772, 1 Sm. L. 389, § 1, 33 P.S. § 1, a tenancy at will, if nothing more, was created." *Id.* at 51–52; *see also* 68 P.S. § 250.202 ("Any such lease [for real property] must be in writing and signed by the parties making or creating the same, otherwise it shall have the force and effect of a lease at will only . . . .").

 ¶ 33 Here, appellants alleged facts that, if proven, would have permitted the finding that the parties entered an agreement, including: appellee promised to enter the lease with appellants; the parties reviewed more than one lease; at the time of signing, appellants "were led to believe by [appellee] that there was an actual meeting of the minds as to the terms and that the lease was in proper form"; "they had no reason to think that [appellee] was not bargaining in good faith"; and the "parties had made a definite oral agreement that [appellants] would rent" the property. First Amended Complaint, at 3, 6, 7.

¶ 34 We believe that the facts as alleged, if proven, permitted the fact finder to conclude that there existed "an agreement which merely awaited the formality of being reduced to writing." Therefore, the trial court did not err when it denied appellee's motion for summary judgment.

## VIII. *Conclusion*

¶ 35 Therefore, the judgment entered in the court below is AFFIRMED.

¶ 36 STEVENS, J., Concurs in the Result.

---

analysis of *Kazanjian*'s applicability here is inappropriate.

**3.** "The Superior Court may affirm the action of the trial court for reasons other than those given by the trial judge." *Strickler v. Huffine,* 421 Pa.Super. 463, 618 A.2d 430, 436 (1992).