J-S27002-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.M., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M., A MINOR, THROUGH HER GUARDIAN AD LITEM | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 235 EDA 2020 |

Appeal from the Order Entered December 11, 2019
In the Court of Common Pleas of Chester County at No(s):  CP-15-DP-0000022-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: T.C., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., A MINOR, THROUGH HER GUARDIAN AD LITEM | : | |
| | : | |
| | : | |
| | : | No. 236 EDA 2020 |

Appeal from the Order Entered December 11, 2019
In the Court of Common Pleas of Chester County at No(s):  CP-15-DP-0000027-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: T.C., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., A MINOR, THROUGH HIS GUARDIAN AD LITEM | : | |
| | : | |
| | : | No. 237 EDA 2020 |

Appeal from the Order Entered December 11, 2019
In the Court of Common Pleas of Chester County at No(s):  CP-15-DP-
0000025-2019

| IN THE INTEREST OF: T.C., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., A MINOR, THROUGH HIS GUARDIAN AD LITEM | : | |
| | : | |
| | : | |
| | : | No. 238 EDA 2020 |

Appeal from the Order Entered December 11, 2019
In the Court of Common Pleas of Chester County at No(s):  CP-15-DP-
0000026-2019

| IN THE INTEREST OF: T.C., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., A MINOR, THROUGH HIS GUARDIAN AD LITEM | : | |
| | : | |
| | : | |
| | : | No. 239 EDA 2020 |

Appeal from the Order Entered December 11, 2019
In the Court of Common Pleas of Chester County at No(s):  CP-15-DP-
0000023-2019

| IN THE INTEREST OF: T.C., A MINOR, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., A MINOR, THROUGH HIS GUARDIAN AD LITEM | : | |
| | : | |
| | : | |
| | : | No. 240 EDA 2020 |

Appeal from the Order Entered December 11, 2019
In the Court of Common Pleas of Chester County at No(s):  CP-15-DP-
0000024-2019


BEFORE:   SHOGAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 31, 2020**

In these consolidated appeals, six minor children, through their guardian *ad litem* ("GAL"), Shannon K. McDonald, appeal from the orders entered on December 11, 2019, in the Court of Common Pleas of Chester County, terminating court supervision of their dependency matters.  The subject children are T.M., a female born in November of 2002; T.C., a female born in October of 2014; T.C. and T.C., twin males born in August of 2013; T.C., a female born in July 2009; and T.C., a male born in November of 2010 (collectively, "the Children").   Upon careful review, we affirm.

The subject orders resulted from the request of Chester County Department of Children, Youth and Families ("CYF") and Greg Rice, the Court Appointed Special Advocate ("the CASA"), during a permanency hearing on December 9, 2019, to close the Children's dependency cases after M.C. ("Mother") and M.C. ("Father") absconded with the Children from Chester County by use of a recreational vehicle ("RV").  CYF and the CASA asserted

_____

[*] Former Justice specially assigned to the Superior Court.

that they had exhausted their efforts to track and locate the family. N.T., 12/9/19, at 12, 18.

The background of this case is as follows. The juvenile court adjudicated the Children dependent on April 18, 2019,[1] after providing services in the home for approximately nine months due to concerns regarding the Children's lack of supervision, hygiene, school performance, behavioral issues, developmental delays, mental-health needs, and unsanitary conditions in the home. Order of Adjudication and Disposition-Amended, 9/27/19, at 2–3.

The court maintained Mother's and Father's physical and legal custody of the five younger children,[2] Mother's physical custody of T.M.,[3] and Mother's and J.M.'s shared legal custody of T.M. Order of Adjudication and Disposition-Amended, 9/27/19, at 6. The court required Mother and Father to participate in the following permanency-plan objectives, in pertinent part:

[M]aintain safe, stable, and clean housing.

[M]aintain stable employment.

_____

[1] The court amended the orders of adjudication and disposition on September 26, 2019, because the original orders inadvertently omitted the "Additional Findings/Orders."

[2] Father is the natural father of the five younger children. Dependency Petitions, 2/26/19. The father of seventeen-year-old T.M. is J.M., who did not file a notice of appeal and is not a party to this appeal.

[3] The court found that T.M. should not reside with J.M. because he lives with his uncle, who has a criminal history of sexual assault. Order of Adjudication and Disposition-Amended, 9/27/19, at 2–3. The court permitted J.M. to have "liberal visits" with T.M. as he and Mother could agree, as long as the visits did not occur at J.M.'s home. *Id.* at 7.

- 4 -

[M]aintain contact with the [CYF] caseworker on a weekly basis. [Mother and Father] will participate in home visits [with the caseworker].

[P]articipate in a mental health evaluation and follow all recommendations and take medications as prescribed.

[P]articipate and work with Life Skills. [Mother and Father] will work to develop a set cleaning schedule including the [C]hildren's clothing and bed linens.

[E]nsure that the [C]hildren are bathed regularly and in clean clothing.

[W]ork to develop a structured schedule that includes providing three nutritious meals a day as well as a structured bed time.

Order of Adjudication and Disposition-Amended, 9/27/19, at 6–7. The court also required Mother and Father to ensure that the Children participate in mental-health evaluations,[4] and that Mother and Father "maintain an appropriate supervision plan that has been approved by CYF where [T.M.] is not the sole caregiver or primary caregiver of the [younger] children." *Id.* at 7.

The first permanency-review hearing occurred on June 12, 2019.[5] By order dated June 25, 2019, the juvenile court found, "There has been

---

[4] The only information in the record with respect to the Children's mental health relates to the two youngest children, who have been diagnosed with Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder. Order of Adjudication and Disposition-Amended, 9/27/19, at 2.

[5] Unless otherwise indicated, the dependency hearings in this case occurred before Tiffany Shoemaker, a juvenile court hearing officer, who prepared recommended orders to the court.

substantial progress and compliance with [the] permanency plan" by Mother and Father. Order, 6/25/19, at 1–2. The court stated that the family would be moving out of their home by July 31, 2019, because the landlord would not renew their lease. Further, the court stated that Father "is seeking a promotion in Florida and has an interview for a position there. Mother and the [C]hildren would be moving with Father." *Id.* at 3.

The June 25, 2019 permanency order maintained Mother's and Father's physical and legal custody of the five younger children. The order granted Mother and J.M. shared physical custody of T.M., and it continued their shared legal custody of her. Order, 6/25/19, at 4–5.

The second permanency hearing occurred on September 16, 2019. Mother did not appear for the hearing, and the court found, "There has been minimal compliance with [the] permanency plan, in that CYF cannot verify housing, employment, treatment." Permanency Review Order, 9/27/19, at 1. With respect to Father, the court determined that he was minimally compliant with the permanency plan for the same reasons, except that he was employed. *Id.* In addition, the juvenile court found that Mother and Father were only minimally compliant because they did not maintain contact with CYF after September 4, 2019. *Id.* Further, the court determined that Life Skills, the agency that provided support in the home, terminated its services "due to the family reporting that they have moved." *Id.* at 1.

During the hearing, Father revealed that the family was residing at an RV campground. Permanency Review Order, 9/27/19, at 3. Father confirmed that the family still intended to move to Florida. *Id.* The juvenile court reported that the Children "are residing in an RV which is somewhere between PA and Florida." *Id.* at 2.

The September 27, 2019 permanency order maintained Mother's and Father's physical and legal custody of the Children as set forth above. Permanency Review Order, 9/27/19, at 4. The order directed Mother and Father to appear at the CYF office within forty-eight hours and to make the RV available for CYF to determine if it provides appropriate housing. *Id.* at 5. In addition, the order directed Mother and Father to "advise CYF immediately of all addresses where they are residing and within 24 hours of any change of address." *Id.* Further, the order required Mother and Father to comply, *inter alia*, with the following permanency objectives: sign releases providing CYF with access to school information for the Children; ensure that the Children's medical and mental-health needs are met; and maintain weekly contact with CYF. *Id.* at 4.

The court held a status-review hearing one week after the September 16, 2019 second permanency review, on September 23, 2019, which Mother, Father, J.M., and the Children attended. The court noted that CYF inspected the RV on September 18, 2019, and determined that it was clean and adequate for the Children. Status Review Order, 9/27/19, at 2. In addition,

the court stated that Mother testified the family "paid [to participate in] a campground membership program where they can move around to different campgrounds but cannot stay in one campground longer than 21 days." ***Id.*** The court indicated that the family was then staying at a campground in Coatesville, Chester County. ***Id.***

With respect to the Children's mental-health evaluations, the juvenile court concluded as follows:

> Mother stated she has taken steps to arrange for [mental-health] evaluations in Pensacola, Florida. The provider is waiting on insurance information to schedule. The [C]hildren have not received any [mental-health] treatment to date. Child Guidance reported to [the] CASA that T.S.[, Mother's and Father's fourth child,] had a [mental-health] evaluation on 7/3/19 and was recommended to receive [mental-health] treatment and has not received any. None of the other children [has received] their [mental-health] evaluations as required under the current [o]rder. [T.S., Mother's and Father's fifth child,] was recommended for treatment but was unsuccessfully discharged on 8/8/19 due to lack of communication with the family.

Status Review Order, 9/27/19, at 2.

The juvenile court also found that the Children were enrolled in a cyber school, which required them to be logged on to a computer for five hours each day. Status Review Order, 9/27/19, at 2. The court noted that Mother contacted the cyber school "and asked them not to share any information with CYF." ***Id.*** Nevertheless, the court explained that the CASA introduced documentation indicating that the Children had poor attendance. ***Id.***

In its opinion pursuant to Pa.R.A.P. 1925(a), the juvenile court aptly summarized its findings set forth in the September 27, 2019 status-review order, as follows:

> Mother had represented that the RV had recently been purchased for $220,000 as the family's residence. The family's plan was to use RV campgrounds, pursuant to a campground membership, and move to Florida. During the hearing, the [C]hildren's sporadic school attendance and uncompleted mental health evaluations or treatment continued to be unresolved issues. **The September 27, 2019 status review order required Mother and Father not to remove the [C]hildren from Chester County until further order of the court[,] and [it] required them to submit a plan for relocation to Florida.**

Juvenile Court Opinion, 2/3/20, at 3 (emphasis added).

On October 2, 2019, the GAL filed a petition for an emergency hearing, wherein she alleged that in violation of the status-review order, Mother and Father departed Chester County with the Children, and they could not be located. Petition, 10/2/19, at unnumbered 2. Further, the GAL asserted that the Children were not being educated, and they had not received mental-health evaluations. *Id.* The GAL requested an emergency hearing to determine whether the Children were safe and their needs were being met. *Id.* at unnumbered 3. In addition, the GAL requested that the hearing occur before the juvenile court rather than the hearing officer because, if Mother and Father failed to appear, "then relief can be given under the Juvenile Court

Rules, specifically[,] a bench warrant be issued for their arrests." Petition, 10/2/19, at unnumbered 3; **see also** Pa.R.J.C.P. 1140 ("Bench Warrants for Failure to Appear").

The emergency hearing occurred on October 3, 2019, and Mother and Father did not appear. The following witnesses testified with respect to serving Mother and Father with notice of the emergency hearing *via* telephone, text message, and/or e-mail: the GAL, the CASA, and Eve Large, CYF legal liaison. In addition, both Father's counsel and Mother's counsel stated on the record in open court that they notified their respective clients of the emergency hearing *via* e-mail, but the parents did not respond, and neither counsel knew where Mother and Father currently were located. **See** N.T., 10/3/19, at 21–23. Further, J.M. testified that he last had contact with T.M. *via* text message on the Sunday evening prior to the hearing, but he did not know where T.M. and Mother were located. **Id.** at 26.

At the conclusion of the testimony, the juvenile court determined that Mother and Father absconded from Chester County with the Children. N.T.,

10/3/19, at 37. Upon the GAL's request, joined by CYF, the juvenile court issued bench warrants pursuant to Pa.R.J.C.P. 1140.[6, 7] *Id.* at 27, 29.

The third and final permanency hearing occurred on December 9, 2019, at which time CYF still had not located Mother and Father. Hannah Hunsinger, the CYF caseworker, testified on direct examination with respect to CYF's efforts to locate the family, as follows:

> Q. What efforts did [CYF] make to try to track the family and find out where they were?
>
> A. So in addition to the phone calls, text messages, e-mails that went unanswered by [Father and Mother], with the help of [the] CASA, we were able to locate the family through a membership that they had for their RV. And we tracked them to Texas where

---

[6] On a date unspecified in the record, the juvenile court quashed the bench warrant with respect to Father. The court explained that it subsequently accepted "the GAL's argument during the October 3, 2019 hearing that Father should be available, if Mother were arrested, to prevent the [C]hildren from entering foster care, and to drive the [C]hildren and himself back to join Mother in Chester County." Juvenile Court Opinion, 2/3/20, at 4, ¶ 2; *see also* N.T., 10/3/19, at 33 (where the GAL stated on the record, "Your Honor, a few specifics that [CYF has] brought up to me. It may be wise to prevent the youth from going to foster care in another state and creating issues, to just have detained [Mother] and not detain [Father]. Is that possible in your order?").

[7] The juvenile court explained:

> Despite the GAL's efforts, [the] non-criminal bench warrant [against Mother] had never been successfully lodged against her in the National Crime Information Center ("NCIC") database. The GAL had informed the court and CYF that the non-criminal nature of Mother's bench warrant led the Chester County authorities responsible for inputting NCIC data to refuse the bench warrant's inclusion.

Juvenile Court Opinion, 2/3/20, at 5, ¶ 7.

we attempted to make a referral, but by the time the referral was made, the family had left Texas.

And so then we were able to locate them in Las Vegas, Nevada[,] through their Netflix account with the help of [J.M.].

Q. When was it that we attempted to track them or we were able to locate where they were in Texas?

A. So their reservation in Texas was up until October 20th, 2019. So on October 15th, we made the referral down there.

Q. That was to Montgomery County CYF in Texas?

A. Yes.

Q. And they were not able to make contact with the family?

A. Correct.

Q. Then we learned that they moved on to Las Vegas, Nevada?

A. Yes.

Q. When were we able to locate them in Las Vegas?

A. We were able to locate them on October 21, 2019.

Q. What efforts were made while the family was in Las Vegas?

A. So we made a referral to Las Vegas, the Department of Children and Families in Nevada[,] on October 21st of October. And they attempted to engage the family. They went out at least four times, knocked on the RV door. However, the family never answered.

The caseworker did report that [Mother's] vehicle was parked there during one of the visits.[8] And during another one, [T.M.] was home, and she was there caring for the kids and said that her parents had gone out to get food.

_____

[8] The record reveals that Mother drove a "unique Mustang." Permanency Review Order, 9/27/19, at 2.

- 12 -

So the caseworker left her business card and asked for [Father and Mother] to call, but [CYF] never heard from them.

Q. Do we know roughly when they left the Las Vegas area?

A. They left I believe it was November 13th. The caseworker said that she attempted to do a late night visit. When [CYF] went out, the family was gone.

Q. Do we know where the family went from there?

A. So through conversations with [J.M.], he was kind of monitoring their Netflix account. They were last logged on outside of Los Angeles, California. We just don't know their exact location.

Q. It is not exact enough for us to figure out what agency in California to contact?

A. Correct.

Q. When was that last log-in on Netflix?

A. On November 26th.

Q. There's been no contact since then?

A. Correct.

Q. You mentioned that you were in contact with [J.M.] and he was somewhat helpful through this process?

A. Yes.

Q. So it is his Netflix account that they were using that he was able to see where they were?

A. Yes.

N.T., 12/9/19, at 4–7.

Ms. Hunsinger further testified that Mother and Father have made "[n]o progress, no compliance" in satisfying their permanency-plan objectives due

to absconding with the Children. N.T., 12/9/19, at 10. Specifically, she testified that the Children "were unenrolled" from their cyber charter school on October 1, 2019. *Id.* at 9. Ms. Hunsinger testified as follows:

Q. [W]hat has [CYF] done to try to determine whether the [C]hildren are in school?

A. Outside of speaking with the cyber school that they were previously enrolled in, we haven't had any way of figuring out if they are in school.

[J.M.] doesn't know if [T.M.] is in school. [T.M.] made a statement [to J.M.] about studying the one day on the phone, but he couldn't say that was because she was in school or . . . exactly what it was for.

*Id.* Moreover, Ms. Hunsinger further testified:

Q. As far as you know, [the Children's former cyber charter school] has not been contacted by any other school in any other state regarding [school] records for the Children?

A. Correct.

*Id.* at 10. On cross-examination by the GAL, Ms. Hunsinger confirmed that she is unaware of any record request made to the cyber school, where the Children were last enrolled, or to their previous public school.[9] *Id.* at 14.

During the third permanency-review hearing, Ms. Hunsinger requested that the juvenile court terminate its supervision of this family and close the dependency cases because "we have exhausted our efforts to locate and

---

[9] The record reveals that the Children previously were enrolled in a public school district in Chester County, where they had resided at the commencement of the dependency cases. Permanency Review Order, 9/27/19, at 3.

engage the family." N.T., 12/9/19, at 12. The CASA joined CYF's request because "we exhausted our efforts to locate and track them[,] and . . . continuing to pursue them is causing [Mother and Father] to create more and more instability for the [C]hildren." *Id.* at 19. In contrast, the GAL requested that the court "take custody of" the Children because of "[t]he concerns reported by the caseworker regarding [the Children's] lack of education[.]" *Id.* at 22, 27.

By orders entered on December 11, 2019, the juvenile court terminated its supervision of the Children. The court reasoned:

> [M.C.], [F]ather of all [the] [C]hildren except [T.M.], and [M.C.], Mother, have absconded with [T.M.], [T.C.], [T.C.], [T.C.], [T.C.], and [T.C.] and left the jurisdiction of this court for residence in another state. CYF and [the] CASA have made repeated and exhaustive efforts to ascertain the current whereabouts of the [C]hildren, tracking them to Texas and Nevada, and attempting to involve law enforcement and the local child protective agencies in those locations. The family has no apparent intention to return to Chester County or Pennsylvania.

Order, 12/11/19.

On January 3, 2020, the Children, by the GAL, timely filed notices of appeal and concise statements of errors complained of on appeal, which this Court consolidated *sua sponte*.

The GAL raises the following issues on appeal:

1. Did the [juvenile] [c]ourt err in closing this matter without resolution of the dependency issues or transfer to any other jurisdiction?

2. Did the [juvenile] [c]ourt err in declining to remove custody of the [C]hildren from the parents?

GAL's Brief at 6.

We review the orders terminating court supervision according to the following standard:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Initially, the GAL asserts, for the first time, that the juvenile court closed the Children's dependency matters in contravention of Pa.R.J.C.P. 1631. The GAL suggests that Rule 1631(A)(1) was not satisfied in this case because the Children's educational and mental-health needs were not met by Mother and Father at the time of the final permanency hearing on December 9, 2019. GAL's Brief at 13. In addition, the GAL avers that Rule 1631(A)(12) and (13) were not satisfied because no court in another county of this Commonwealth or in another state has accepted jurisdiction.

In its Pa.R.A.P. 1925(a) opinion, the juvenile court explained that the GAL never raised Rule 1631(A) during the permanency hearing. Juvenile Court Opinion, 2/3/20, at 7. Our review of the record confirms this fact. Instead, at the hearing, the GAL focused only upon changing custody of the Children, as addressed *infra*.

Issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a). In *Jahanshahi v. Centura Development Co., Inc.*, 816 A.2d 1179 (Pa. Super. 2003), we noted that our Supreme Court has frequently stressed the necessity of raising claims at the earliest opportunity to "eliminate the possibility that an appellate court will be required to expend time and energy reviewing claims on which **no trial ruling has been made**." *Id.* at 1189 (emphasis in original) (citation omitted). More recently, we clarified:

> On appeal, we will not consider assignments of error that were not brought to the tribunal's attention **at a time at which the error could have been corrected** or the alleged prejudice could have been mitigated. *Tindall v. Friedman*, 970 A.2d 1159, 1174 (Pa. Super. 2009). "In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter." *Id.* (quoting *Thompson v. Thompson*, 963 A.2d 474, 475-46 (Pa. Super. 2008) (citation omitted)).

*State Farm Mutual v. Dill*, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*) (emphasis added). Thus, we conclude that this issue is waived.[10]

---

[10] Even if not waived, we agree with CYF that in terminating services, the juvenile court *sub silentio* determined that court-ordered services no longer are needed and the Children "remain[] with the guardian and the circumstances which necessitated the dependency adjudication and placement have been alleviated," thereby satisfying Pa.R.J.C.P. 1631(A)(1). CYF's Brief at 4–11.

In her second issue, the GAL argues that rather than terminating supervision and closing the dependency cases, the court should have changed the Children's placement by granting CYF physical and legal custody pursuant to 42 Pa.C.S. § 6351(f)(1)[11] and Pa.R.J.C.P. 1514(A)(1).[12] The GAL asserts that the court erred "when, without other recourse to get compliance from the parents, the [juvenile] [c]ourt declined to remove the [C]hildren from the custody of the parents in an effort to return them to" Chester County. GAL's

_____

[11] Section 6351 of the Juvenile Act provides, in relevant part:

**§ 6351. Disposition of dependent child.**

\* \* \*

**(f) Matters to be determined at permanency hearing**.— At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

42 Pa.C.S. § 6351(f)(1) (emphasis in original).

[12] Rule 1514 provides, in relevant part:

**Rule 1514. Dispositional Findings Before Removal From Home**

**A. Required findings.** Prior to entering a dispositional order removing a child from the home, the court shall state on the record in open court the following specific findings:

(1) Continuation of the child in the home would be contrary to the welfare, safety, or health of the child;

Pa.R.J.C.P. 1514(A)(1) (emphasis in original).

Brief at 15. Further, the GAL asserts that the court erred because it is in the Children's best interests to remove them from Mother's and Father's custody "to ensure [they] are getting the needed educational and mental health supports[.]" *Id.*

As noted, during the third permanency-review hearing, the GAL requested that the court "take custody of" the Children. N.T., 12/9/19, at 22. With respect to how the court would enforce such an order in light of the family's disappearance and the inability to include the outstanding bench warrant against Mother in the NCIC database because of its non-criminal nature, the following colloquy occurred:

> THE COURT: How am I supposed to force these parents to do something when I can't get my hands on them[,] and they are not here?
>
> [THE GAL]: If you issue—
>
> THE COURT: There are 3500 counties in this country. I'm only a judge in one.
>
> [THE GAL]: If you issue an order revoking [Mother's and Father's] custody rights, then there are ways to enforce a custody order that apply differently than dependency, and . . . we know that there are better rules in place for custody issues than there are for dependency issues. That is my proposal. . . .

*Id.* at 25.

Upon inquiry by the juvenile court, counsel for CYF responded as follows:

> THE COURT: What do you think of [the GAL's] suggestion that the [c]ourt terminate custody [of] the parents and give it to CYF?

[CYF's counsel]: We actually did look into that and discussed that on our end because, yes, if you were to do that, we could essentially turn the case over to the county detectives.

If they are charged then with a criminal offense of interfering with custody, obviously the D.A.'s office and detectives have far more superior ways to track down somebody and find them than we do, and also have the ability to . . . issue a criminal bench warrant that could be acted upon by other authorities in another state.

Our concern and the reason we did not go down that road is . . . the factual basis. . . . [W]hat do we actually hang our hat on to do that[?]

[W]e went back and forth a lot in this case. Do we really feel that these people are a danger[,] or the [C]hildren are in danger[,] or is it just that they are not getting certain services that they should be getting. We don't know for a fact if [the Children] are actually in danger or not. I understand there are concerns about truancy and all that, but again, these are unknowns. And our concern is in order to be able to hang our hat and create a factual basis to change custody, we just don't know that we have that.

* * *

And I would say [CYF] also does have the concern of . . . the trauma that can be inflicted upon children being taken away from their parents. And, in this case, you would be taking [the C]hildren away from their parents in California somewhere, and then everybody having to be transported back here across the country, which are some of the concerns we were voicing when we were discussing the bench warrant.

N.T., 12/9/19, at 32–33.

Thereafter, the GAL stated on the record: "I think that actually if you are really looking for facts as to why it is you can transfer custody, you can rely upon the educational factor here. . . . [I]n order to place a child into a

school, that school must do a records request from the prior school."[13]  N.T.,

12/9/19, at 34.  The colloquy between the GAL and the court continued:

> THE COURT: Anywhere in the country?
>
> [GAL]: Anywhere in the country. . . .
>
> THE COURT: How do you know that?
>
> [GAL]: Because that is how I have seen it happen in multiple schools from multiple states.  . . .
>
> I also know that [the C]hildren had IEPs in place, and those IEPs are required to be transferred with the child.  And that is another factor that would be inquired into when enrolling in another school. . . .

*Id.* at 34–35.

In its Rule 1925(a) opinion, the juvenile court set forth the following

factual finding:

> 5.  During the December 9, 2019 hearing, the CYF caseworker credibly testified that she had no way to determine if the [C]hildren were in school.  Although the GAL stated that in her experience[,] the lack of a school records request to the [C]hildren's former school necessitated a finding that they were not attending a school, that statement was insufficient for the court to find that the [C]hildren were not attending school. Instead, the court found as a fact that it was unknown at the December 9th hearing whether the [C]hildren were attending school.  There was also no credible evidence presented to the

---

[13]  It is important to note that the GAL did not include the lack of evaluations and/or treatment for the Children's mental health as a basis for changing their placement.  As such, we deem waived the GAL's argument that the court abused its discretion in not changing the Children's placement due to their mental-health needs. *See Jahanshahi v. Centura Development Co., Inc.*, 816 A.2d at 1189 ("Claims which have not been raised in the trial court may not be raised for the first time on appeal").

court that the [C]hildren were unsafe, or that their health, physical, mental or moral welfare was endangered.

Juvenile Court Opinion, 2/3/19, at 4–5. We discern no abuse of discretion by the court in basing its decision on credibility findings in favor of Ms. Hunsinger, who testified that CYF does not know whether the Children are in school. **See** N.T., 12/9/19, at 9 ("Outside of speaking with the cyber school that they were previously enrolled in, we haven't had any way of figuring out if they are in school.").

The juvenile court ultimately concluded that changing the Children's placement is not in their best interests because the GAL's request

> is an attempt to manipulate a remedy in criminal court, under the guise of 'interference with child custody' (12/9/2019 N.T., p. 23), thereby enabling law enforcement to charge Mother and Father with that crime and issue NCIC registered arrest warrants against them. (12/9/2019 N.T., p. 32). Even if this intentional use of a dependency court order to engineer a criminal arrest were permitted, . . . the court did not have sufficient evidence to issue it, and its issuance would cause unjustifiable hardship to the [C]hildren.[14]

---

[14] Further, the juvenile court concluded:

> [T]his scheme to elevate Mother['s] and Father's conduct into criminal behavior would ultimately fail. Interference with custody of children, 18 Pa.C.S. § 2904(a), requires that the charged defendant 'knowingly or recklessly' takes a child from the custody of its lawful custodian. How could probable cause be established to issue an arrest warrant when the order transferring custody could not be prove[n] to have been received by Mother and Father? It could not.

Juvenile Court Opinion, 2/3/20, at 9; **see also** 18 Pa.C.S. § 2904(a) (Interference with custody of children) (providing, "A person commits an

Juvenile Court Opinion, 2/3/20, at 8. The court continued:

> Furthermore, the intended result of the transfer, the arrest of Mother and Father, the forced removal of their six children, the [C]hildren's transportation, likely across a continent, and mandated residence with strangers in an unfamiliar setting, would create unwarranted stress on the [C]hildren. Placing such foreseeable trauma on these [C]hildren is antithetical to dependency court's purpose to create a disposition in a child's best interests, "best suited to the . . . mental and moral welfare of the child." 23 Pa.C.S. § 6351(a). These [C]hildren would likely never forgive those who knowingly caused them such hardship, nor forget the sudden cleaving of their lives. The GAL's argument at the October 3, 2019 hearing[,] that a bench warrant should not be issued against Father[,] was premised, in part, to prevent this type of governmentally induced trauma from being inflicted. The court accepted the correctness of that argument. It continues to be correct. Trauma to these [C]hildren must be avoided if possible.
>
> Although removal of the [C]hildren from Mother and Father would surely punish them for violating the court's order requiring them not to leave Chester County without permission, punishment of parents is not a purpose of dependency court. There are occasions when an available legal remedy appears to be inadequate to redress wrongful conduct. It is never appropriate, however, for a court to manipulate the law or facts to create a response deemed more acceptable to the jurist or litigants. In the present case, the transference of custody from Mother and Father to CYF may appear to vindicate the authority of the court in the face of a blatant disregard of its underlying dependency order, but it would be unlawful, unwise and unjust. . . .

Juvenile Court Opinion, 2/3/20, at 10–11.

---

offense if he knowingly or recklessly takes or entices any child under the age of 18 years from the custody of its parent, guardian or other lawful custodian, when he has no privilege to do so.").

Upon careful review, the record supports the juvenile court's findings of fact and credibility determinations. We hold that the court's inferences and conclusions of law are reasonable in light of those findings. Accordingly, we affirm the orders terminating court supervision.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/20