J-A23041-24
J-A23042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN RE: L.C., A MINOR                     :     IN THE SUPERIOR COURT OF
                                         :        PENNSYLVANIA
                                         :
                                         :
APPEAL OF: J.C., FATHER                  :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :     No. 683 MDA 2024

Appeal from the Decree Entered April 11, 2024
In the Court of Common Pleas of Susquehanna County
Orphans' Court at No:  ADOPT-007-2023

IN RE: L.C., A MINOR                     :     IN THE SUPERIOR COURT OF
                                         :        PENNSYLVANIA
                                         :
APPEAL OF: J.C., FATHER                  :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :     No. 684 MDA 2024

Appeal from the Decree Entered April 11, 2024
In the Court of Common Pleas of Susquehanna County
Orphans' Court at No:  ADOPT-005-2023

IN RE: S.C., A MINOR                     :     IN THE SUPERIOR COURT OF
                                         :        PENNSYLVANIA
                                         :
APPEAL OF: J.C., FATHER                  :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :     No. 685 MDA 2024

Appeal from the Decree Entered April 11, 2024
In the Court of Common Pleas of Susquehanna County
Orphans' Court at No:  ADOPT-006-2023

J-A23041-24
J-A23042-24

| | | |
|---|---|---|
| IN RE: L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 686 MDA 2024 |

Appeal from the Decree Entered April 11, 2024
In the Court of Common Pleas of Susquehanna County
Orphans' Court at No:  ADOPT-005-2023

| | | |
|---|---|---|
| IN RE: L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 687 MDA 2024 |

Appeal from the Decree Entered April 11, 2024
In the Court of Common Pleas of Susquehanna County
Orphans' Court at No:  ADOPT-007-2023

| | | |
|---|---|---|
| IN RE: S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 688 MDA 2024 |

Appeal from the Decree Entered April 11, 2024
In the Court of Common Pleas of Susquehanna County
Orphans' Court at No:  ADOPT-006-2023

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY STABILE, J.:                **FILED: DECEMBER 20. 2024**

- 2 -

H.J. ("Mother") and J.C. ("Father") (collectively, "Parents") appeal from the April 11, 2024 decrees that granted the petitions filed by the Susquehanna County Services for Children and Youth ("CYS" or "the Agency") and involuntarily terminated their parental rights to their biological son, L.C. ("La.C."), born in August 2013, and their biological daughters, L.C. ("Li.C."), born in November 2017, and S.C., born in October 2014 (collectively, the "Children").[1]  After careful consideration, we affirm.

The orphans' court aptly set forth the relevant facts and procedural history of this case in an opinion that accompanied the subject termination decree, as follows:

> 1. On April 12, 2021, [CYS] filed a shelter care application for the [C]hildren . . . .
>
> . . .
>
> 4. Prior to the filing of the shelter care petition, CYS had been working unsuccessfully with the family to address a variety of issues: (1) the conditions in the home were poor; (2) the parents were abusing controlled substances; and (3) truancy issues involving [La.C.] and [S.C.].[2]
>
> . . .

_____

[1] As Parents have appealed the same decrees and raise similar issues arising from the same factual and procedural events, we *sua sponte* consolidate the above-captioned cases for disposition.  **See** Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

[2] The Agency received an initial intake report with respect to the family in February 2021.  **See** N.T., 11/20/23, at 57.

- 3 -

10. On April 12, 2021, the court granted the shelter care application and granted CYS emergency protective custody of the [C]hildren.

11. On April 14, 2021, a shelter care hearing was conducted, and the court entered a shelter care order providing CYS with legal and physical custody of the [C]hildren.

. . .

13. On April 15, 2021, CYS filed dependency petitions contending that the [C]hildren were dependent under 42 [Pa.C.S.A.] §§ 6302(1) & (5).

14. A hearing on the dependency petition was conducted on April 19, 2021. At that hearing, the court made the following findings:

a. CYS had been informally working with the family for some period prior to the initiation of the dependency proceedings.

b. Despite this intervention, [Parents] had truancy charges filed against them in connection with the school attendance of [La.C.] and [S.C.].

c. [Parents] had repeatedly denied CYS access to their home.

d. [Parents] had ignored efforts by CYS to provide services to the family prior to filing the dependency petition.

e. When CYS did gain access to the family home, it was discovered that the home was in poor condition.

f. [Parents] were utilizing controlled substances.

g. Several family members volunteered to assist [Parents] and provided a home for the [C]hildren, but these family members were unable to serve as long-term resources.

h. [La.C.] had missed 46 full days of school during the 2020-2021 school year as of April 2021.

i. [S.C.] had missed 35 full days of school during the 2020-2021 school year as of April 2021.

- 4 -

j. In addition to the truancy issue, the [C]hildren were often late or tardy to school.

15. The court found the [C]hildren to be dependent children under 42 [Pa.C.S.A.] § 6302(1) [and established permanency goals of return to parent or guardian.[3] In addition, the court granted Parents weekly supervised visitation.] The [C]hildren were placed in kinship care in the maternal grandmother's residence where Mother was also residing.

16. [Parents] were directed to complete the following requirements:

a. [Parents] were directed to obtain a drug and alcohol evaluation and follow through with the treatment recommendations.

b. [Parents] were directed to comply with general protective services.

c. [Parents] were directed to complete a parenting program.

d. [Parents] were directed to obtain a mental health evaluation and follow through with the treatment recommendations.

e. [Parents] were directed to obtain appropriate housing for the [C]hildren.

f. [Parents] were required to submit to random urine screenings.

g. Mother was directed to cooperat[e] with her probation officer.

---

[3] The court additionally established the Children's concurrent permanency goals of adoption. *See* Permanency Review Orders, 9/27/21 (Agency Exhibit 2). Then, on December 13, 2022, the court changed the Children's respective permanency goals to adoption. *See* N.T., 11/20/23, at 58; Permanency Review Orders, 12/13/22 (Agency Exhibit 2). Neither Father nor Mother appealed.

h. [Parents] were directed to obtain and maintain employment.

. . .

Opinion, 4/11/24, at 1-5.

In August 2021, the Children, who had resided in kinship care with their maternal grandmother, were moved to separate foster care placements. Approximately one year later, Li.C. and S.C. joined La.C. in the pre-adoptive foster home of B.B., where they remained at the time of the subject proceedings. **See** Opinion, 4/11/24, at ¶¶ 17, 18, 42; **see also** N.T., 3/3/24, at 73, 79-80, 82; N.T., 11/20/23, at 57, 61. Significantly, "[La.C.] is a nonverbal autistic child with significant special needs." Opinion, 4/11/24, at ¶ 2. The foster mother explained that he has severe developmental delays and, while ten years old, he was developmentally equivalent to a 19-month-old. **See** N.T., 3/3/24, at 73, 76.

From September 2021, through February 2023, the court conducted regular permanency review hearings at which it characterized Parents' respective compliance with the permanency plan and progress towards alleviating the circumstances which necessitated placement as minimal at best. **See** Agency Exhibit 2. Father, who remained incarcerated at the time of the subject hearings, was imprisoned in September 2022 and was serving

a one-and-a-half-to-four-year sentence.[4]  ***See*** N.T., 3/3/24, at 110-111, 165-166; N.T., 11/20/23, at 59, 139.

During this time period, Parents were unsuccessfully discharged from multiple mental health treatment programs, substance abuse treatment programs, and parenting programs.  ***See*** N.T., 11/20/23, at 43-44, 48, 90-91; ***see also*** Agency Exhibit 2.  They refused drug and alcohol screens and/or tested positive for illegal substances on numerous occasions.  ***See*** N.T., 11/20/23, at 90; ***see also*** Agency Exhibit 2.  Additionally, Parents failed to complete planned renovations to Mother's family home, where they proposed to reside upon reunification, to make it acceptable for the Children.  ***See*** N.T., 3/3/24, at 106-107, 124, 127, 139-140, 145, 153; N.T., 11/20/23, at 51, 80-81, 92.  Specifically, "there w[ere] not adequate bedrooms . . . and . . . there w[ere] a lot of safety concerns with the basement of the home . . . ."  N.T., 11/20/23, at 80-81.  Moreover, Parents' visitation with the Children never progressed beyond supervised and was inconsistent as Parents each missed numerous visits.  ***See*** Agency Exhibit 2; ***see also*** N.T., 11/20/23, at 90-91.

---

[4] As best we can discern, Father was arrested in May 2021, on drug-related and firearms charges to which he later pleaded guilty.  In September 2022, he was incarcerated in Susquehanna County Correctional Facility and thereafter, at a time unspecified in the record, transferred to SCI-Camp Hill. ***See*** Agency Exhibit 2.  Father additionally faced pending charges in New York, including drug-related and firearms charges, which were ultimately dismissed. ***See*** N.T., 3/3/24, at 111, 163-165.

On June 26, 2023, the Agency filed petitions to involuntarily terminate Parents' parental rights to each of the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). The court held an evidentiary hearing on the Agency's petitions on November 20, 2023, at which time the Agency presented the testimony of Sara Conklin, Agency caseworker, and Mena Soliman, Nurse Practitioner from Ophelia Medical Group, who testified with respect to Mother's medically-assisted drug treatment. The hearing continued on March 4, 2024, at which time the Agency presented the testimony of Gregory Adams, Director of Special Education, Montrose Area School District; Elizabeth Rogowski, Special Education Coordinator, The Graham Academy; Veronica Perlick, Family Resource Specialist, JusticeWorks Youthcare;[5] and foster mother. Mother and Father additionally testified on their own behalf.

Upon commencement of the subject hearings, the Children were ten, nine, and nearly six years old, respectively, and had been in care for over two-and-one-half years. They were represented at both hearings by their court-appointed guardian *ad litem* ("GAL"), Michael Gathany, Esquire, who also had served as their GAL in the underlying dependency proceedings. Additionally, at the conclusion of the November 20, 2023 hearing, the court appointed

---

[5] We observe that the notes of testimony for the March 3, 2024 hearing indicate that there was no audio for a five-minute period of time during the testimony of Ms. Perlick. **See** N.T., 3/3/24, at 66. Notwithstanding, we do not find that this technological failure hampers our review.

Rachel Thomas, Esquire, as their legal counsel.[6,7]  ***See*** N.T., 11/20/23, at

152-153.

_____

[6] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in conformity with" 23 Pa.C.S.A. § 2313(a).  ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020).  Further, if the appointed counsel also serves as GAL, "appellate courts should review *sua sponte* whether the orphans' court made a determination" that the child's legal interests and best interests "did not conflict."  ***Id.***  These findings by the orphans' court must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel.  ***See id.*** at 1236 ("Both inquiries involve a yes or no answer that can be addressed by a review of the orphans' court order (or lack thereof) appointing counsel to represent a child under Section 2313(a).").

In this case, the court did not initially appoint separate legal counsel or make a determination that the Children's best interests and legal interests did not conflict.  However, the court appointed legal counsel prior to the second day of the termination hearing and prior to the Agency's completion of its case-in-chief.  Importantly, there was a gap of four months between the first and second hearing dates.  On March 4, 2024, the second and final date of the hearing, the Agency again presented the testimony of its caseworker, Ms. Conklin.  Further, the court admitted an update from Ophelia Medical Group. We therefore conclude that the court has satisfied the requirement of Section 2313(a).

Nevertheless, we caution the court against failing to comply with the Supreme Court's mandate to issue a separate order appointing counsel to represent the legal interests of a child involved in an involuntary termination matter and, if the appointed counsel also serves as GAL, to determine "**prior to appointment**" whether the child's dual interests did not conflict.  ***K.M.G.***, 240 A.3d at 1236 (emphasis added); ***see***, ***e.g.***, ***Interest of A.J.R.O.***, 270 A.3d 563 (Pa. Super. 2022) (vacating involuntary termination decree because the orphans' court failed to determine whether the child's legal interests and best interests conflicted prior to appointing a single attorney to represent both; and remanding to allow the common pleas court to make the required determination).

[7] At the conclusion of the subject evidentiary hearings, both Attorney Gathany and Attorney Thomas argued in favor of termination.  ***See*** N.T., 3/3/24, at
*(Footnote Continued Next Page)*

Of relevance, on November 20, 2023 and March 3, 2024, the court categorized Mother's compliance with the permanency plan, while still assessing her progress towards alleviating the circumstances which necessitated placement as moderate as minimal. Due to his ongoing incarceration, the court continued to characterize Father's compliance and progress as minimal. *See* Opinion, 4/11/24, at 25-31.

Pursuant to decrees dated April 10, 2024, and entered April 11, 2024, the orphans' court granted the Agency's petitions and involuntarily terminated Parents' parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (b). The court contemporaneously issued an opinion setting forth its reasoning. On May 8, 2024, Parents separately filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[8] The orphans' court filed a responsive Rule 1925(a) opinion on May 24, 2024.

Although framed slightly differently, we discern that Parents have essentially raised the same claims in their respective appeals. *See* Father's Brief at 4; Mother's Brief at 5-6. Specifically, Parents allege that there was insufficient evidence to support the involuntary termination of their parental

_____

184-185. Both attorneys also submitted briefs on behalf of the Children to this Court advocating in favor of affirmance.

[8] Mother filed amended notices of appeal, pursuant to order of this Court, on June 24, 2024.

rights. **See id.** Additionally, Parents argue that the orphans' court erred by terminating their parental rights despite the absence of a "written report" from either Attorney Gathany or Attorney Thomas. **See id.**

We begin our review by addressing Parents' claims concerning the absence of a "written report" from the Children's legal counsel with respect to their preferred outcome of the termination proceeding. **See** Father's Brief at 23-27; Mother's Brief at 23-24. Preliminarily, we observe that the requirements of 23 Pa.C.S.A. § 2313(a) have been met in the above-captioned cases. **See supra** at 9 n.6. To the extent that Parents have assailed the lack of a written report from the Children's legal representatives, Parents failed to request such a report or place any objection to the lack of a written report on the record in the orphans' court. As such, Parents failed to preserve this issue, and it is waived. **See** Pa.R.A.P. 302(a) (providing for waiver of issues not first raised in the lower court); **see also Interest of T.M.**, 239 A.3d 193, 201 (Pa. Super. 2020) ("[O]ur Supreme Court has frequently stressed the necessity of raising claims at the earliest opportunity to eliminate the possibility that an appellate court will be required to expend time and energy reviewing claims on which no trial [court] ruling has been made.") (cleaned up).[9]

---

[9] To the extent that Father argues, in the alternative, that the orphans' court erred in failing to conduct an *in camera* interview, this argument is also waived as it was not preserved below. **See** Father's Brief 26-27; **see also** Pa.R.A.P.
*(Footnote Continued Next Page)*

Even if not waived, we would find that these claims are without merit.

Parents have not cited any statute or precedent that would require the

Children's legal representatives to issue a "written report" detailing their

client's preferences in the course of termination proceedings. Contrary to

Parents' claims, our Supreme Court has explicitly declined to adopt a

requirement that a child's legal representative must divulge his client's

preferences in a specific fashion. **See K.M.G.**, 240 A.3d at 1237-1238 ("[W]e

find nothing in the language of the Adoption Act requiring that their preference

be placed on the record. . . . Moreover, we observe that the child's legal

counsel has a duty of confidentiality . . . such that they should not be

compelled to disclose the child's preferences."); **see also In re P.G.F.**, 247

A.3d 955, 966 (Pa. 2021) ("[S]ignificant deference must be accorded to

counsel's approach in discerning a child's preferences and the child's

articulation thereof.").

We therefore proceed to Parents' claims challenging the sufficiency of

the evidence as it relates to the termination of their parental rights. Our

standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights,
> appellate review is limited to a determination of whether the

---

302(a); **see also T.M.**, 239 A.3d at 201. Even if not waived, this argument
fails. **See In re B.L.L.**, 787 A.2d 1007, 1016 (Pa. Super. 2001) ("[I]n
involuntary termination proceedings, the testimony of the child is not a
requisite part of the inquiry. . . . No statute or case law exists which requires
or permits the child's testimony to be an element of that review."); **see also
In re B.J.Z.**, 207 A.3d 914, 919–920 (Pa. Super. 2019).

decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b),

- 13 -

which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b).

In the case *sub judice*, the trial court terminated Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(2), (5), and (b). To affirm the underlying decree, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we limit our discussion to Section 2511(a)(2) and (b),[10] which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

---

[10] The Agency, in its appellee brief, states that Father waived any claim related to Section 2511(a) because he did not include this issue in his statement of questions presented in his brief. ***See*** Agency's Brief at 13. However, it is clear that Father intended to include a challenge to Section 2511(a) inasmuch as he asserted error regarding in his Rule 1925(b) statement, and he includes it in the argument section of his brief. ***See*** Rule 1925(b) statement, 5/8/24, at ¶ 1. Additionally, the orphans' court addresses Section 2511(a) in its opinion accompanying the decrees. Therefore, we will address Father's claim with respect to this section.

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . . . **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it**." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted) (emphasis in original). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104

(Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023).

We have long recognized that "[p]arent are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443. Relatedly, while a parent's incarceration is not automatically dispositive with respect to termination, it **is** a relevant and potentially determinative factor to consider pursuant to Section 2511(a)(2). Specifically,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012); *see id.* at 830. Further, a "child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what [he] is supposed to do in prison." *In re E.A.P.*, 944 A.2d 79, 84 (Pa. Super. 2008).

Parents argue that there were insufficient grounds for termination pursuant to Section 2511(a)(2). Specifically, they assert that they had each made recent efforts toward reunification which yielded appreciable progress. *See* Mother's Brief at 17-18; Father's Brief at 16-19. Mother highlights her recent progress reflected at the March 2024 permanency review hearing. She states, in part:

As of the most recent review hearing, March 2024, [] Mother had moderately complied with the permanency order[] and had made moderate progress toward alleviating the circumstances that led to the initial placement. Specifically, [Mother] was financially supporting the children through payments to Susquehanna County Domestic Relations. She had made progress in the construction in her home. The progress was significant that it earned her a compliment from the [Agency]'s case worker. [Mother] recognized [La.C.] had significant special needs. She saw that his needs required special handling. Thus, she took the initiative and made an appointment with the child's school administrator to discuss his progress. Accordingly, [] Mother has demonstrated a willingness and ability to perform her parental duties, and termination under (a)(2) was improper.

Mother's Brief at 17-18. Father likewise emphasizes his recent efforts toward the assumption of parental duties and recent progress. *See* Father's Brief at 16-19. He maintains that, despite his incarceration, he demonstrated "serious and significant efforts to address the circumstances that led to placement."[11] *Id.* at 16. For example, Father notes his completion of the therapeutic treatment block and peer mentoring programs at his correctional facility, as well as the dismissal of his criminal charges in New York. *See id.* at 16-18.

However, the orphans' court recognized Parents' limited progress and cooperation. *See* Opinion, 4/11/24, at 39-42. As the record supports the orphans' court's finding that "[Parents] demonstrated no commitment to working with CYS to address the issues that had led to the removal of the

---

[11] We observe that Father conflates grounds for termination pursuant to Section 2511(a)(2) with Section 2511(a)(1), focusing on his actions in the six months prior to the filing of the petition and the termination hearing. *See* Father's Brief at 16-19.

- 17 -

[C]hildren from their home and their continued placement," Parents' arguments fail. *Id.* at 39.

The record reveals Parents' blatant and abiding failure to either cooperate with the Agency or engage with services aimed at reunification. As detailed *supra*, throughout the vast majority of the underlying dependency proceedings, the court characterized Parents' compliance and progress as none to minimal. *See* Agency Exhibit 2. It was not until November 2023, that the court found Mother to be in moderate compliance, although it still found that she made minimal progress. Father's compliance and progress remained minimal due to his continuing incarceration. *See* Opinion, 4/11/24, at 25-28.

Significantly, Parents were unsuccessfully discharged on numerous occasions from substance abuse treatment, mental health treatment, and parenting programs. *See* N.T., 11/20/23, at 43-44, 48, 90-91; *see also* Agency Exhibit 2. In her testimony, Mother admitted to several prior discharges from mental health treatment programs. *See* N.T., 3/3/24, at 111. Further, as testified by Ms. Conklin, and confirmed, in part, by Ms. Perlick, Parents were discharged on multiple occasions from JusticeWorks' Nurturing Parenting Program and were subsequently discharged from another similar

initiative.[12]  *See* N.T., 3/3/24, at 42-44, 108-110; N.T., 11/20/23 at 48, 91; *see also* Agency Exhibits 2, 6 & 8.  Ms. Conklin had no documentation or knowledge of Mother's current engagement in a parenting program.  *See* N.T., 3/3/24, at 108; N.T., 11/20/23, at 47.  Further, although recognizing Father's participation in a parenting program while in Susquehanna County Correctional Facility, she had no documentation supporting completion of this program.  *See* N.T., 11/20/23, at 81-82, 84.

Likewise, the certified record demonstrates that Parents frequently either refused to submit to drug and alcohol screens and/or tested positive for illegal substances.  *See* Agency Exhibit 2.  Ms. Conklin testified that throughout the dependency proceedings, Parents refused to participate in requested drug and alcohol screens over 30 times.  *See* N.T., 11/20/23, at 90.  Ms. Conklin reported that Mother declined such screens as recently as October and November 2023, and January 2024.  *See* N.T., 3/3/24, at 106, 122-123; N.T., 11/20/23, at 46-47.

Parents also failed to complete planned improvements to Mother's family home, where they proposed to reside upon reunification, in order to make it safe and appropriate for the Children.  The Agency was able to partially assess the home in January 2024 and learned construction had not yet begun, despite

---

[12] While the Agency stipulated to Mother's completion of a basic parenting program in June 2023, this did not fulfill the requirement of completion of an in-home parenting program.  *See* N.T., 3/3/24, at 146-148; *see also* N.T., 11/20/23, at 48.

the Children having been in placement for nearly three years. Although work subsequently began in February 2024, over six months after the filing of the termination petitions, it was not completed by the conclusion of the subject hearings. *See* N.T., 3/3/24, at 106-107, 139-140, 145, 153; N.T., 11/20/23, at 51, 80-81, 92.

Ms. Conklin additionally noted Mother's refusal to execute releases and/or her rescindment of releases in connection with reunification services. *See* N.T., 3/3/24, at 100; N.T., 11/20/23, at 91. Similarly, Ms. Conklin explained that Father refused to place her on his call list at the prison and declined to participate in a "legal telephone call" with her in September 2023, related to visitation and his participation in services while incarcerated. He did however subsequently engage in contact with Ms. Conklin. *See* N.T., 11/20/23, at 54-55, 84.

Moreover, at the time of the subject hearing, Father had been incarcerated since September 2022, with a minimum sentence ending in June/July 2024 and a maximum sentence ending at a time unspecified in 2026. *See* N.T., 3/3/24, at 110-111, 165-166; N.T., 11/20/23, at 59, 139.

Hence, we discern no abuse of discretion by the trial court in concluding that termination of parental rights pursuant to Section 2511(a)(2) is warranted. The record substantiates the conclusion that Parents' repeated and continued incapacity and/or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and

mental well-being. *See A.H.*, 247 A.3d at 443. Moreover, Parents cannot or will not remedy this situation. *See id.* Despite the fact that Parents had finally begun to take some affirmative actions, they had failed to achieve reunification after almost three years. This is simply too little too late. After such a lengthy and protracted period of time, the Children are entitled to permanency. We reiterate that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id.* at 443. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to Section 2511(a)(2), we must next determine whether termination was proper under Section 2511(b). Section 2511(b) affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must

be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*K.T.*, 296 A.3d at 1105-06 (cleaned up).

In doing so, trial courts must examine the effect on the child of severing such a bond, which requires "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1109. Our Supreme Court has explained:

Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

*K.T.*, 296 A.3d at 1109-1110 (some citations omitted). As such, the Court concluded, "to grant termination when a parental bond exists, there must be

- 22 -

clear and convincing evidence that the bond is not necessary and beneficial."
***Id.*** at 1114.

The Court recognized that bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." ***Id.*** at 1109. It is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." ***M.E.***, 283 A.3d at 839 (cleaned up). It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." ***Id.*** We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. ***Id.***

With respect to Section 2511(b), Parents assail the orphans' court's alleged failure to assess their respective bonds with the Children or to ascertain the impact of severing these bonds. ***See*** Mother's Brief at 21-22; Father's Brief at 20-22. We must disagree.

The certified record amply demonstrates that the Children did not have a necessary and beneficial bond with Parents. There is no dispute that a bond exists. However, the record reveals that their bond has diminished over the thirty-four months of placement. Indeed, Parents' contact with the Children was inconsistent and never progressed beyond supervised visitation. ***See*** N.T., 11/20/23, at 90-91; ***see also*** Agency Exhibit 2. Ms. Conklin testified that Parents missed "numerous" supervised visits and/or were tardy throughout the entirety of the Children's dependencies. ***See*** N.T., 11/20/23,

at 48-49, 90-91. This was confirmed by Ms. Perlick. *See* N.T., 3/3/24, at 52, 54, 60. Ms. Conklin described that prior to May 2023, a month prior to the filing of the termination petitions, Mother's visitation "has always been inconsistent." *See* N.T., 11/20/23, at 48. Mother did not engage in visitation with the Children from August 31, 2022, to February 1, 2023. *See id.* at 49; N.T., 3/3/24, at 115-116; *see also* Agency Exhibit 2. Ms. Conklin similarly confirmed unspecified extended periods of time, prior to his incarceration in September 2022, where Father failed to visit with the Children. *See* N.T., 11/20/23, at 56, 59. Since his incarceration, Father participated in in-person visitation with the Children while at Susquehanna County Correctional Facility and eventually virtual visitation while at SCI-Camp Hill. *See* N.T., 3/3/24 at 110; N.T., 11/20/23, at 54-56, 84-85.

Further, as it relates to Mother's visitation with the Children, Ms. Conklin described such visitation, until more recently, as "chaotic and stressful," devoid of any consistency and boundaries. *See* N.T., 11/20/23, at 50. This testimony was echoed by Ms. Perlick with respect to her observations while providing parenting services to Parents. *See* N.T., 3/3/24, at 52, 54, 60. Nonetheless, Ms. Conklin testified that a bond exists between the Children and Mother, but it has diminished over the thirty-four months they have been in placement, as follows.

> Q: So, do you consider there to be a bond between the [C]hildren and [M]other?

A: I do believe there is a bond. I do believe that the circumstances have led to a disconnect a little bit, but they do enjoy seeing her.

Q: When you say disconnect, what are you – what do you mean?

A: The transition of it throughout the last 34 months, the -- the change has really been -- in the beginning there was a lot of crying. There was a lot of confusion. There was a lot of begging and pleading, why we can't wait for mommy to -- to get there, you know.

They're -- they -- they're also went almost six months where there was absolutely no contact between [M]other and the [C]hildren from August 31st of 2022 until February of 2023. That -- that was a substantial amount of time that those children had no contact with their mother and I think at that point, that's when it changed. If there was a visit, there's a visit. If there's not, there's not. There's -- they -- they see her. They're happy. It just -- but there's not the begging and pleading like there was before.

*Id.* at 115-116.

Conversely, Ms. Conklin testified that, "without a doubt," a bond exists between the Children and their foster mother, whom they refer to as "grandma." *See id.* at 83, 117. Significantly, the Children ask their foster mother to remain at visitations. *See id.* at 85. They seek her for comfort, and she ultimately provides discipline, if necessary. *See id.* at 116. S.C. additionally began assuming her foster mother's surname on her school assignments. *See id.* at 84, 116-117.

Ms. Conklin stated that, unlike with Parents, all of the Children's needs are being met by their foster mother, who is a pre-adoptive resource. *See* N.T., 3/3/24, at 82, 118; N.T., 11/20/23, at 64. The Children's foster mother explained that La.C. is making progress. *See* N.T., 3/3/24, at 73, 76. She

recounted that he will now respond to his name and come back when called, rather than absconding. He is also less aggressive. *See id.* at 77. Further, the foster mother testified that, in contrast to when his placement began with her, La.C. was able to independently feed and dress himself at the time of the termination hearing. *See id.* at 77-78.

The testimonial evidence also demonstrates that the Children have progressed well in school under the care and guidance of their foster mother. *See* N.T., 3/3/24, at 80; N.T., 11/20/23, at 62-65; *see also* Agency Exhibits 3, 4, & 5. At the time of the termination hearing, La.C. had an individualized education program ("IEP") and was in a specialized school where, aside from academics, he received occupational therapy, speech therapy, and behavior intervention. *See* N.T., 3/3/24, at 26-28; N.T., 11/20/23, at 62, 65. Notably, Ms. Rogowski reported that La.C. had made "significant progress." *See id.* at 30-31. Likewise, Ms. Conklin testified that La.C. was "thriving." *See* N.T., 11/20/23, at 62. Further, S.C., then in second grade, had improved her reading skills from "below average" to "above average." *See* N.T., 3/3/24, at 80. Similarly, Li.C., then in kindergarten, knew how to read. *See id.* Overall, Ms. Perlick testified that the Children's educational progress is the result of the stability afforded by their foster mother. *See id.* at 59. As such, Ms. Conklin testified that it is the best interests of the Children to grant termination based on their need for consistency and progress both educationally and

behaviorally and their bond with their foster mother. **See** N.T., 3/3/24, at 117-118; N.T., 11/20/23, at 93.

To the extent Parents contend that the orphans' court based its determination on environmental factors, such as housing conditions and financial circumstances, this argument is without merit. **See** Mother's Brief at 22-23; Father's Brief at 21-22. Indeed, the foregoing testimonial evidence unequivocally supports the court's conclusion that the involuntary termination of parental rights will serve the developmental, physical and emotional needs and welfare of the Children pursuant to Section 2511(b).

Based on the foregoing, we affirm the decrees involuntarily terminating Parents' parental rights pursuant to Section 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/20/2024